■ The People of the State of New York, Respondent, v Dupree Harris, Appellant. [985 NYS2d 643]—

Appeal by the defendant from a judgment of the Supreme Court, Kings County (Demarest, J.), rendered March 17, 2005, convicting him of bribing a witness (three counts), upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

The defendant stands convicted of three counts of bribing a witness for conduct aimed at convincing three teenage girls to recant their statements identifying his brother, Wesley Sykes, as the man who shot and killed Dennis Brown in a park in Brooklyn. The primary issue raised on appeal is whether the trial court's evidentiary rulings, which permitted the prosecution to offer evidence that a fourth eyewitness to the Brown shooting, Bobby Gibson, was murdered the weekend before he was scheduled to testify against Sykes, deprived the defendant of a fair trial. We conclude that the defendant was not deprived of a fair trial and, accordingly, affirm.

The evidence presented at the defendant's trial reveals that on the evening of September 4, 2001, Sykes rode his bicycle into a park in the Bedford-Stuyvesant section of Brooklyn, exchanged a few words with Brown, and fired several shots at him. On September 27, 2001, Brown died of the injuries he suffered in the shooting. A number of Brown's friends were in the park and witnessed the shooting, including three teenage girls, Shaquanna Edmonds, Latisha Smith, and Naia Hardison, and one young man, Bobby Gibson. Sykes was arrested for Brown's murder on October 23, 2001, and that night five eyewitnesses, including Gibson and two of the girls, identified him from a

lineup as the shooter. All three girls subsequently gave sworn audiotaped statements to police detectives and an assistant district attorney identifying Sykes as the shooter.

In May and June of 2002, as the date scheduled for his brother's murder trial approached, the defendant made contact with each of the teenage girls who had witnessed the Brown shooting, and began to shower them with gifts and attention. Prior to meeting the defendant, each of the girls heard rumors that he was a dangerous man, and that he was looking for them. Describing these events, Shaquanna Edmonds testified that before she met the defendant for the first time in June 2002, a friend told her that the defendant wanted to talk to her, and that he was "mad about his brother." The friend urged Edmonds to talk to the defendant because the defendant was a "very dangerous person," and the friend did not want to see anything happen to Edmonds. However, once Edmonds actually met the defendant, he was "very nice," took her out to restaurants to eat, and gave her $100 on two different occasions. On one occasion, Edmonds accompanied the defendant to a hotel, where he made "romantic overtures."

Latisha Smith similarly testified that in the months after the defendant's brother was arrested, two different friends told her that the defendant wanted to talk to her, and one of these friends warned her that the defendant was "capable of hurting people." She met the defendant in late May 2002, and for a period of about a month, he called her frequently, took her out and bought food for her, and gave her money on a couple of occasions. During this period, Smith became so close to the defendant that they engaged in sexual relations.

The third girl, Naia Hardison, also testified that she was nervous when the defendant initially approached her and asked to talk to her, because she had heard a lot of rumors about him on the street. She had heard "that it's either lie or die. He supposed to do this to us if we don't testify." Despite the rumors, the defendant was nice to her, showed her love like a big brother, took her out for meals, and gave her $500 or $600.

After establishing a relationship with the three girls, the defendant asked each one to speak to Michael Warren, the attorney defending his brother in the Brown murder case, and recant their identifications of Sykes as the shooter. On separate occasions in June 2002, the defendant brought each girl to Warren's office to make recorded statements in which each recanted her prior identification of Sykes as the shooter, and stated instead that Corey McCollough, who had been with Sykes in the park that night, shot Brown over a gang-related dispute. The

defendant gave each of the girls $500 shortly after they made their statements to Warren.

A jury was selected in the Sykes trial on Thursday, June 27, 2002, and the presentation of evidence was scheduled to commence on Monday, July 1, 2002. On Thursday, June 27, Assistant District Attorney Steven Murphy met with Bobby Gibson, one of the eyewitnesses scheduled to testify against Sykes. Although Murphy had also arranged to meet with Edmonds and Smith, they did not appear, and Smith expressed reluctance to meet with him and come to court.

In the early morning hours of Saturday, June 29, 2002, Gibson was shot and killed. A man named Travis Ragsdale subsequently confessed to the murder, claiming that he was drunk when he got into an argument with Gibson at a party, resulting in the shooting. Although Ragsdale was charged with murder in the first degree on a witness-elimination theory, he was ultimately acquitted of that charge, and convicted of murder in the second degree.

Meanwhile, Edmonds was awakened from her sleep by the sound of gunshots on the morning of Saturday, June 29, 2002, and looked out her window to see Gibson's body lying on the ground. She recalled thinking to herself, "What's next? I guess I'm next." Smith was also scared when she heard that Gibson had been killed, because at that time nobody knew who had killed him. Detective Warren Bond located all three girls that evening, and went to see them to ensure that they were all right. Although the girls "seemed very edgy," they told Bond that they were okay. When asked why she did not reveal her contact with the defendant to the police at that point, Edmonds replied that she was worried about her "life," explaining that she "didn't know what was next," and what the consequences of the shooting would be.

On the following evening, Sunday, June 30, 2002, Detective Bond received a phone call from Smith, who said that she had something to tell him. When Bond went to Smith's location to meet with her, he found Edmonds and Hardison there as well. All three girls were very nervous and edgy. After much discussion, Smith told Detective Bond that she had been approached by an individual who told her that the girls "can either take money not to testify against Wesley Sykes or they can take a bullet." Smith then disclosed that the girls had taken money from the defendant not to testify against Sykes. The three girls were transported to the police precinct, where they gave recorded statements to Assistant District Attorney Murphy. Murphy asked each of the girls whether they wished to be

relocated, and each replied that she did. The three girls and their families were immediately relocated to hotels by the District Attorney's office. Smith, Edmonds, and Hardison all testified at the Sykes trial, and identified Sykes as the shooter. The defendant was present in court for his brother's trial on the morning of Monday, July 1, 2002. However, as court officers gathered in the courtroom to arrest him that day, he left the courthouse and disappeared. The defendant was eventually located in Virginia using a false name, and was arrested on December 19, 2002. He was thereafter indicted on charges of witness tampering in the third degree (three counts) and bribing a witness (three counts).

Whether and to what extent to admit evidence that Gibson had been murdered just before he was to testify against Sykes was the subject of extensive discussion between the court, the prosecutor, and defense counsel during the course of the trial. The issue was first raised by the court prior to jury selection, because the trial judge was concerned that prospective jurors might have seen press coverage of Gibson's murder, linking it to his role as a witness in the Sykes trial and implicating the defendant. Defense counsel argued that no reference at all should be made to the Gibson murder at trial because it was "wholly immaterial, separate and entirely unrelated" to the bribery and witness tampering charges against the defendant. The prosecutor argued that testimony regarding Gibson's death was relevant to explain why the three teenage girls came forward to the District Attorney, and that absent evidence of Gibson's death, the jury would be left to wonder why these witnesses "turned around" on the day of the Sykes trial. The prosecutor also emphasized that defense counsel had "explored" the files related to the relocation of the girls, "which are ugly" and which showed that the girls were "difficult" witnesses who had misbehaved in the hotels where they had been placed. He urged that it would be "obscene" to allow defense counsel to impeach the credibility of the girls by cross-examining them about the money given to them by the District Attorney's office for housing and living expenses during their relocation "without knowing the dangers involved and why all these things took place." After hearing arguments by counsel, the court indicated that it would formulate an instruction that would inform the jury that another person had been tried and found guilty of killing Gibson, and that there was no evidence that the defendant was responsible for Gibson's death. Thereafter, in its preliminary instructions to prospective jurors, the court informed them that there had been extensive press coverage of some of the issues in the case, including the recent trial of a man named Travis

Ragsdale for the murder of Robert Gibson. The court advised the prospective jurors that the defendant was "not in any way accused of being involved in that murder."

During a subsequent colloquy on this issue, the prosecutor indicated that he intended to elicit from the three girls that Gibson's death was relevant to their states of mind because each had recanted her original statement identifying Sykes, and then adhered to her original statement. The court then ruled that testimony of the murder of another witness to the Brown shooting was "clearly appropriate and necessary given the nature of the case and the history of the witness[es]' testimony."

Defense counsel returned to this issue after jury selection, reiterating her position that the Gibson murder was unrelated to this case, and further arguing that because the homicide occurred after the events alleged in this case, it could not have gone to the state of mind of the complainants. She requested that if the court allowed evidence of the Gibson murder to be presented on the prosecution case, she be allowed to have Ragsdale's videotaped confession played to the jury. The court adhered to its ruling that the prosecutor could make reference to the Gibson murder and its impact on the girls' decision to change their minds about exonerating Sykes, but instructed him not to "belabor it" or insinuate that the defendant was connected to it.

In accordance with the court's ruling, in his opening statement, the prosecutor referred to the Gibson murder and the impact it had on the girls. However, he cautioned the jury that it was important to remember that the defendant was on trial for bribing witnesses and witness tampering, that they would hear no evidence that the defendant was anywhere near the location of the Gibson shooting, and that someone else had been arrested for that shooting.

During the course of direct examination, the prosecutor elicited testimony from each of the three girls regarding the manner in which they learned of Gibson's death, and the impact of his death upon them. In addition, the prosecutor was permitted to elicit testimony from Smith that at some point in June 2002, she heard the defendant state that he wanted to talk to two other witnesses to the Brown murder, Gibson and the victim's brother, Corey Brown. The court allowed the prosecutor to elicit this testimony from Smith over defense counsel's objection, concluding that defense counsel had opened the door by making an issue in her opening statement about the fact that although 8 to 10 people in the park witnessed the crime, the defendant had allegedly approached only the three teenage girls.

After the People rested, defense counsel moved to admit Travis Ragsdale's videotaped confession into evidence for the truth of his account of the Gibson murder. The court ruled that it would permit the videotaped confession into evidence, but warned defense counsel that if she put the tape in, she was giving the People the right to challenge the credibility of Ragsdale's statements. The videotaped confession was thereafter played for the jury, and the court instructed the jury that since Ragsdale was admitting to criminal conduct, his statements were an exception to the hearsay rule, and were being admitted for their truth. Defense counsel thereafter stipulated to the admission of rebuttal evidence consisting of a portion of Gibson's autopsy report. The autopsy report indicated that Gibson was killed by a bullet which entered his lower back, traveled through his abdomen, and perforated his spleen, liver, and heart.

On summation, defense counsel argued that the case against the defendant was a "witch hunt," triggered by the assumption that Gibson was killed because he was a witness in the Sykes case. She submitted that this assumption "couldn't be further from the truth" in light of Ragsdale's confession. Defense counsel also challenged the girls' credibility by stressing that they were receiving money from the District Attorney's office each week during their relocation, and commenting that "[t]hese girls, they had assistance, and they treated the District Attorney's office like their personal bank." She added that the prosecution's attempt to suggest the existence of a link between Gibson's killing and his role as a prospective witness in the Sykes trial had been "[w]holly created" by the District Attorney's office for the purpose of justifying the relocation of the girls. She also argued that the evidence at the Sykes trial pointed to Corey McCollough as the shooter, and asserted that the statements the girls made to Warren were indeed true, and they thereafter changed their stories only because the District Attorney threatened to arrest each one.

During his summation, the prosecutor also discussed the Gibson murder, commenting that, "We don't have evidence that [the defendant is] behind the killing of Bobby Gibson. You don't have evidence that even his brother Sykes did it. Might have. There's a lot of reasons to speculate about it. But, if you don't have evidence, you don't arrest the person for the crime. So much for the witch hunt." The prosecutor additionally focused on the credibility of Ragsdale's confession, arguing that it left unanswered as many questions as it answered, including the identity of the person who allegedly passed Ragsdale the gun he used to shoot Gibson, and why both Gibson and another wit-

ness to the Brown murder were present "at the same time that Travis Ragsdale was there with a gun." He also noted that defense counsel was, in essence, asking the jury to believe that Ragsdale's confession was the "end of [the] story" without asking further questions.

In its charge, the court instructed the jury that, as it had "repeatedly from the very beginning of this trial" told them, the defendant had "not been charged with causing the death of the witness Bobby Gibson." The court also noted that the People had introduced evidence of Gibson's death "for the purpose of explaining the state of mind of the three of the complainants . . . and to provide the background for their participation in the witness protection program of the District Attorney's office."

At the conclusion of the defendant's trial, the jury returned a verdict acquitting him of three counts of witness tampering in the third degree and convicting him of three counts of bribing a witness. The defendant now appeals.

Initially, we reject the defendant's contention that the verdict convicting him of three counts of bribing a witness was not supported by legally sufficient evidence. Pursuant to Penal Law § 215.00, a person is guilty of bribing a witness when he or she "confers, or offers or agrees to confer, any benefit upon a witness or a person about to be called as a witness in any action or proceeding upon an agreement or understanding that . . . the testimony of such witness will thereby be influenced." Viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620 [1983]), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. The evidence presented at trial established that as his brother's murder trial approached, the defendant sought out and befriended the three teenage girls who had identified Sykes as the man who shot Dennis Brown, taking them out to eat and giving them monetary gifts. He then asked each of them to make false statements exonerating his brother to his brother's attorney, Warren, took them to Warren's office and remained with them as they made their statements, and gave each of them $500 shortly after they made their statements to Warren. A rational trier of fact could have found, based on this evidence, that the defendant had "at least a unilateral perception or belief" (*People v Bac Tran*, 80 NY2d 170, 178 [1992]) that the gifts and affection he conferred on each witness would influence her testimony in his brother's upcoming trial. Moreover, upon our independent review pursuant to CPL 470.15 (5), we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]; *People v Goldman*, 175 AD2d 723, 724 [1991]).

We further find that the defendant was not deprived of a fair trial by the admission of evidence that Gibson was murdered on the weekend before he was to testify as a witness in the Sykes trial, and of the defendant's statement that he wanted to speak to Gibson shortly before the murder. The general rule in New York is that all relevant evidence is admissible at trial unless its admission is barred by some exclusionary rule (*see People v Mateo*, 2 NY3d 383, 425 [2004], *cert denied* 542 US 946 [2004]; *People v Scarola*, 71 NY2d 769, 777 [1988]; *People v Pearce*, 81 AD3d 856 [2011]). "Evidence is relevant if it has any tendency in reason to prove the existence of any material fact, i.e., it makes determination of the action more probable or less probable than it would be without the evidence" (*People v Scarola*, 71 NY2d at 777; *see People v Alvino*, 71 NY2d 233, 241 [1987]). Relevant evidence may nevertheless be excluded by the trial court in the exercise of its discretion if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury (*see People v Caban*, 14 NY3d 369, 374-375 [2010]; *People v Scarola*, 71 NY2d at 777).

Evidence of uncharged crimes is generally excluded under the *Molineux* rule (*People v Molineux*, 168 NY 264 [1901]) for policy reasons, because such evidence may induce the jury to base a finding of guilt on collateral matters, or to convict a defendant because of his or her past criminal history (*see People v Alvino*, 71 NY2d at 241). Nevertheless, evidence of prior uncharged crimes may be received if it is relevant to some issue other than the defendant's criminal disposition (*see People v Morris*, 21 NY3d 588, 594 [2013]). The purposes for which uncharged crime evidence may properly be admitted include completing the narrative of the events charged in the indictment and providing necessary background information (*see People v Morris*, 21 NY3d at 594; *People v Till*, 87 NY2d 835, 837 [1995]). "Where there is a proper nonpropensity purpose, the decision whether to admit evidence of the defendant's prior bad acts rests upon the trial court's discretionary balancing of probative value and unfair prejudice" (*People v Dorm*, 12 NY3d 16, 19 [2009]; *see People v Holden*, 82 AD3d 1007, 1008 [2011]).

However, "[t]he *Molineux* rule was created to address a particular prejudice inherent to a particular type of proof: evidence of a defendant's prior crimes and bad acts" (*People v Cortez*, 22 NY3d 1061, 1077 [2014, Abdus-Salaam, J., concurring]). That type of prejudice is not present in this case, because evidence that Gibson was murdered two days before he was scheduled to testify against Sykes did not constitute proof that the defendant

committed an uncharged crime or bad act. Thus, evidence of the Gibson murder is not *Molineux* evidence. In this regard, we note that although the prosecutor did indeed express his personal belief that the defendant was involved in the Gibson murder to the trial court during a colloquy, he did not express that belief to the jury. Rather, he stated to the jury, during both his opening statement and summation, that they would hear no evidence that the defendant was involved in the Gibson murder, and that he was not charged with that crime. While the prosecutor suggested the existence of a connection between Gibson's role as a prospective witness in the Sykes trial and his murder by questioning the credibility of portions of the Ragsdale confession on summation, he did not argue to the jury that the defendant was involved in Gibson's death. Further, the court minimized any possibility that the jury would mistakenly view the evidence of Gibson's murder as evidence that the defendant was involved in that crime by instructing the jury that the defendant had not been charged in Gibson's death, and that the evidence of Gibson's murder had been introduced for the limited purpose of explaining the state of mind of the three girls, and providing background for their participation in the witness protection program (*see People v Morris*, 21 NY3d at 598). Jurors are presumed to have followed a trial judge's limiting instructions (*see People v Morris*, 21 NY3d at 598; *People v Davis*, 58 NY2d 1102, 1104 [1983]).

Even if the evidence of Gibson's death could arguably be viewed as suggesting that the defendant committed an uncharged crime, it was properly admitted to explain why the girls, having recanted their original statements identifying Sykes as Dennis Brown's killer, admitted to the police that they had made false recantations, and adhered to their original statements. Indeed, two of the girls testified that Gibson's murder, two days before the presentation of evidence in the Sykes trial was to begin, frightened them. The impact of Gibson's murder on the state of mind of these witnesses was interwoven with the narrative of the charged crimes, and necessary to help the jury understand the case in context, because it explained the girls' conduct in coming forward to disavow the recorded statements they had made to Warren which exonerated Sykes and implicated Corey McCollough in the Brown murder (*see People v Tosca*, 98 NY2d 660, 661 [2002]; *People v Genyard*, 84 AD3d 1398, 1400 [2011]; *People v Devaughn*, 84 AD3d 1394, 1395 [2011]; *People v Jordan*, 74 AD3d 986 [2010]). Although the defendant contends that evidence of the Gibson murder had no probative value because it occurred after each girl had already recanted her original statement to law enforcement officials and

accepted $500, we disagree. The absence of a credible explanation for why the girls readopted their original statements would have lent support to the defense argument that the statements the girls made to Warren were indeed true, and that Corey McCollough, not Wesley Sykes, was Brown's killer. The fact that it could be alternatively argued that the girls reneged on their agreement with the defendant and testified against Sykes at his trial because they were afraid of being imprisoned for perjury does not diminish the relevance of the proffered testimony in elucidating a key part of the narrative.

Moreover, in our view, it cannot be fairly said on this record that there was no proof establishing that Gibson's murder played a role in the girls' decision to retract their recantations. Both Edmonds and Smith acknowledged that the Gibson murder frightened them, and on the day after the shooting, Smith reached out to Detective Bond, who responded by going to meet with her. It was at that meeting with Bond that Smith disclosed that an individual had approached her and told her that the girls "can either take money not to testify against Wesley Sykes or they can take a bullet," and thereafter disclosed their dealings with the defendant. It can reasonably be inferred from this evidence that the girls' decision to come forward was motivated, at least in large part, by fear engendered by Gibson's murder on the eve of his scheduled trial testimony in the Sykes case.

The evidence that Gibson was murdered shortly before he was to testify in the Sykes trial was also necessary to explain why the girls were placed in the District Attorney's witness protection program. Although the defendant maintains that evidence of the girls' participation in the witness protection program was immaterial because his trial counsel did not intend to make it an issue in the case, he did not object to the admission of this evidence at trial. Moreover, the record does not support the defendant's assertion that his attorney did not intend to make the girls' participation in the witness protection program an issue in this case. When the trial court first raised the issue of the Gibson murder, the prosecutor noted that defense counsel had examined the relocation files showing that the girls were difficult witnesses who had misbehaved in the hotels where they had been placed, and that "it would be obscene for the jury to be left with the impression that—without knowing the dangers involved and why all these things took place, just to hear about efforts we are making to give witnesses money." During a lengthy discussion of this issue, defense counsel herself never represented to the trial court that she would not use the information contained in the relocation files

to impeach the girls' credibility on cross-examination. Indeed, when the trial court stated that evidence of the Gibson murder was necessary to provide context in light of defense counsel's intent to cross-examine the girls about incidents that occurred while they were participating in the witness protection program, defense counsel responded only by stating that she would ask for an immediate instruction that there was no connection between the Gibson murder and the defendant. Defense counsel thereafter extensively cross-examined each girl, in great detail, about the housing and other benefits received through participation in the witness protection program. Evidence that the District Attorney's office had expended significant sums of money to provide the girls and their families with housing and living expenses during their participation in the witness protection program was pivotal to the defense theory that their statements to Warren exonerating the defendant's brother were true, and that they disavowed those statements because of the monetary benefits they received from the District Attorney. Defense counsel also used information gleaned from the relocation files to cross-examine each girl about her conduct while participating in the program. This included questioning Edmonds as to whether she and her family had been kicked out of a hotel for "hanging out until all hours of the night in the lobby," questioning Smith about angry messages she had left for the prosecutor because she felt that the District Attorney's office was manipulating her and treating her unfairly, and eliciting testimony from Hardison that she had gotten into fights in some of the hotels where she had been placed, and had been kicked out of them.

To clarify, we do not suggest, as the dissent indicates, that defense counsel "opened the door" to the admission of evidence of the girls' participation in the witness protection program by examining the relocation files, and failing to represent that she would not cross-examine the girls on this subject. The dispute in this case involved the admission of evidence of the Gibson murder, not of the girls' participation in the witness protection program, and it is clear from the record that the admission of this evidence was a key part of the defense strategy.

More importantly, as our dissenting colleague recognizes, it has been held that there is no compelling reason why testimony "directly bearing on the motive to testify of a critical witness in a criminal trial, whose motive is important to an evaluation of her credibility . . . may not be considered as serving an appropriate probative purpose" for the admission of uncharged crime evidence (*People v Beckles*, 128 AD2d 435, 439 [1987]; *see*

*People v Rodriguez*, 143 AD2d 854, 855 [1988]). The admission of evidence bearing on the credibility of key witnesses serves the truth-finding process, in which it is the jury's role to "assess the credibility of witnesses and determine, for itself, what portion of their testimony to accept and the weight such testimony should be given" (*People v Negron*, 91 NY2d 788, 792 [1998]; *see People v Morris*, 21 NY3d at 597-598). Evidence that Gibson's death motivated the girls to come forward to the police and admit that they had been bribed by the defendant was particularly important to an assessment of their credibility in this case, since, as noted, a major theme of the defense was that the girls had retracted their recantations because of the money and benefits they received through their participation in the witness protection program. In the absence of evidence establishing a legitimate need for the girls' participation in the program, the jury would not be able to place the defense argument in proper context. Accordingly, the trial court properly exercised its discretion in determining that the jury should be permitted to hear evidence of Gibson's murder.

While our dissenting colleague also expresses concern that the admission of evidence of the Gibson murder on the People's direct case caused the defendant to be subjected to a "trial within a trial" to determine whether he was complicit in the homicide, the defendant himself has not advanced this argument. In any event, we are satisfied that the defendant was not improperly subjected to a trial within a trial to determine his involvement in the Gibson murder. As noted, the jury was instructed that the defendant was not charged in the Gibson murder and instructed as to the limited purposes for which testimony of the murder was to be considered. Moreover, the prosecutor did not elicit any evidence of the defendant's involvement in the Gibson murder, and informed the jury in his opening that they would hear no such evidence. Although the prosecutor offered a portion of Gibson's autopsy report as rebuttal evidence to challenge the credibility of Ragsdale's account of the shooting, defense counsel was clearly warned by the court that she would open the door to such rebuttal if she sought to admit Ragsdale's videotaped confession into evidence. While the rebuttal evidence could be viewed as casting doubt on Ragsdale's account of how and why the shooting occurred, it was not tantamount to an attempt to prove the defendant's involvement in an uncharged crime.

It is also important to keep in mind that the subject of the Gibson murder, and the admissibility of evidence of its occurrence, were first raised by the trial court itself out of concern

that prospective jurors might have seen press coverage suggesting that Gibson was murdered because he was a witness in the Sykes trial, and that the defendant was involved in the murder. The court brought this issue to the forefront to afford the prosecutor and defense counsel a full opportunity to present arguments relating to the probative value of the challenged testimony, and its potential for prejudice, and ruled that evidence of the Gibson murder was admissible only after extensive discussions with the prosecutor and defense counsel. This is not a situation in which the trial court made its ruling without taking into consideration the potential that the defendant could be prejudiced by the admission of evidence of the Gibson murder.

Further, the trial court properly permitted the prosecutor to elicit testimony that Smith heard the defendant state that he wanted to talk to two other witnesses to the Brown murder, Gibson and the victim's brother, Corey Brown. Defense counsel opened the door to this testimony by emphasizing during her opening statement that the girls were not the only witnesses to the Brown murder, and that in fact 8 to 10 people had witnessed the shooting, thus suggesting that there would be no reason for the defendant to single out just three of the witnesses against his brother (*see People v Mateo*, 2 NY3d at 425-426; *People v Rojas*, 97 NY2d 32, 38-40 [2001]; *People v Martin*, 100 AD3d 930 [2012]).

The defendant's contention that he was deprived of a fair trial by certain comments the prosecutor made on summation relating to the Gibson murder is largely unpreserved for appellate review, since he failed to object to most of the challenged statements (*see* CPL 470.05 [2]; *People v Morency*, 104 AD3d 877, 878 [2013]; *People v Hines*, 102 AD3d 889, 890 [2013]). In any event, the challenged remarks were fair comment on the evidence, constituted a fair response to defense counsel's summation, or otherwise do not warrant reversal (*see People v Galloway*, 54 NY2d 396, 401 [1981]; *People v Ashwal*, 39 NY2d 105, 109-110 [1976]; *People v McGowan*, 111 AD3d 850 [2013]; *People v Barton*, 110 AD3d 1089 [2013]; *People v Morency*, 104 AD3d at 878).

We also find no merit to the defendant's contention that his adjudication as a persistent felony offender was unconstitutional pursuant to *Apprendi v New Jersey* (530 US 466 [2000]; *see People v Battles*, 16 NY3d 54, 59 [2010], *cert denied* 565 US —, 132 S Ct 123 [2011]; *People v Quinones*, 12 NY3d 116 [2009], *cert denied* 558 US 821 [2009]; *People v Rivera*, 5 NY3d 61 [2005], *cert denied* 546 US 984 [2005]; *People v Rosen*, 96 NY2d 329 [2001], *cert denied* 534 US 899 [2001]; *People v Bazemore*,

100 AD3d 915, 916 [2012]; *People v Watts*, 89 AD3d 965, 966 [2011]).

The defendant's claim that the court improperly relied upon an unproven allegation of misconduct in imposing sentence is unpreserved for appellate review (*see People v Walters*, 90 AD3d 958, 959 [2011]; *People v Mathieu*, 83 AD3d 735, 737 [2011]; *People v Baez*, 52 AD3d 840 [2008]) and, in any event, without merit (*see People v Walters*, 90 AD3d at 959; *People v Vaughan*, 20 AD3d 940, 941-942 [2005]).

The court providently exercised its discretion in sentencing the defendant as a persistent felony offender (*see* Penal Law § 70.10 [2]). The court's determination that the nature of the defendant's criminal conduct, his history, and his character warranted extended incarceration and lifetime supervision is supported by the record (*see People v Dixon*, 107 AD3d 735, 736 [2013]; *People v Maxwell*, 22 AD3d 607 [2005]; *People v Perry*, 19 AD3d 619 [2005]).

The defendant's remaining contentions, raised in his pro se supplemental brief, are unpreserved for appellate review and, in any event, without merit. Eng, P.J., Rivera and Lott, JJ., concur.

Miller, J., dissents, and votes to reverse the judgment and order a new trial on the counts of the indictment charging the defendant with bribing a witness: I respectfully dissent.

The Supreme Court's decision to permit the People to introduce evidence of an uncharged crime during their case-in-chief had a far-reaching impact on the course and character of the defendant's entire trial. The court's evidentiary rulings permitted the defendant to be cast as a man who had been involved in a heinous witness-elimination murder and the specter of that uncharged crime overshadowed the charges for which the defendant was on trial. The focus of the trial was so completely shifted to the uncharged murder that the case unraveled into a trial within a trial at which both sides presented the jury with evidence to establish questions of fact relating to the defendant's involvement in the uncharged crime. The probative value of such evidence, inferential at best, was confined to collateral matters which bore such a slight and tenuous connection to the relevant issues of this case that the prosecutor struggled to articulate its relevance without resorting to empty legalism and metaphor. The prejudice suffered by the defendant as a result of this inflammatory evidence of witness-elimination was severe and unmistakable, yet the prospect of prejudice was wholly ignored by the trial court when it decided to expose the jury to evidence of murder. For these reasons and the ones that follow, I conclude that the defendant was deprived of a fair trial

and that he is entitled to a new one on the counts of the indictment charging him with bribing a witness.

The defendant was charged with three counts of tampering with a witness in the third degree (*see* Penal Law § 215.11) and three counts of bribing a witness (*see* Penal Law § 215.00). At trial, the People called three young women, all between the ages of 20 and 21 years old (hereinafter collectively the complainants), who each testified that they were present when an individual shot another individual in a park on September 4, 2001. The complainants testified that after being contacted by law enforcement personnel, they eventually identified the defendant's brother as the shooter and made audiotaped statements in the presence of detectives and an assistant district attorney to that effect.

The complainants stated that sometime in May or June 2002, they began to hear rumors that the defendant was a dangerous person and that he was looking for them. They testified that they heard that the defendant was "mad about his brother" and that he would make sure that they "either lie or die." The complainants testified that eventually they were each contacted by the defendant, but that he treated them well, lavishing them with gifts and affection. Portions of the complainants' testimony indicated that the defendant wanted them to recant their identification of his brother as the shooter. In June 2002, the complainants each separately traveled with the defendant to the office of his brother's attorney, where they made audiotaped recordings in which they recanted their identification of the defendant's brother and instead indicated, consistent with the defendant's view, that another individual was responsible for the shooting. The complainants testified that the defendant was present when they recanted their stories and that he gave each of them $500 shortly after they visited the lawyer's office. The complainants each testified that the statements they gave at the lawyer's office were not true.

Prior to the beginning of the trial, defense counsel had sought to preclude the prosecution from introducing evidence of an uncharged crime: the murder of a man named Bobby Gibson. The prosecutor opposed defense counsel's application, arguing that it was "impossible and ludicrous" to separate the two cases, and that precluding reference to the Gibson murder would be "obscene." The Supreme Court initially concluded that the fact that Gibson was murdered was not necessarily connected to this case. However, the prosecutor argued that this ruling was "outrageous," and referenced a prior trial in which the same defense attorney allegedly used a favorable evidentiary ruling to deceive

the jury. After the prosecutor expressed his personal "belie[f]" that the defendant was "behind the killing of the witness," the court determined that it would permit the People to introduce evidence relating to that uncharged crime. Defense counsel "vehemently" objected and argued that the prejudice would deprive the defendant of a fair trial.

Based on this pretrial ruling, the People were permitted to elicit evidence, in their case-in-chief, that in June 2002—two days before the defendant's brother was scheduled to be tried for the shooting—an individual named Bobby Gibson was shot and killed. Gibson was identified as a potential witness in the case against the defendant's brother, and although the prosecutor repeatedly disclaimed any intention of linking the defendant to Gibson's murder, he nevertheless elicited evidence from one of the complainants that the defendant had told someone that he wanted to speak with Gibson prior to Gibson's death. After learning that Gibson had been shot and killed, one of the complainants testified that she thought that she was "next" and she contacted the two other complainants who stated that they did not fear the defendant and had no reason to go to the police.

None of the complainants initiated contact with the police after Gibson was killed. When police contacted the complainants after Gibson's death, they were told that the complainants had no problems, and the complainants did not request assistance or disclose their interactions with the defendant. However, the police later learned that the complainants had given new statements to the attorney representing the defendant's brother after receiving a telephone call from one of the complainants. The complainants were then directed to report to the District Attorney's office, where they were informed that they could be arrested for changing their original statements. Thereafter, the complainants gave new statements consistent with their original statements, and they ultimately testified against the defendant's brother at his subsequent trial. The People were also permitted to elicit additional testimony on their direct case to establish that in the wake of Gibson's death, the complainants were placed in a witness protection program where they and their families were provided with housing and other public assistance.

The trial then degenerated into a trial within a trial. In response to the People's evidence showing that Gibson was killed two days before the trial of the defendant's brother and shortly after the defendant himself was heard saying he wanted to talk to him, the defendant was permitted to play a videotaped state-

ment in which an individual named Travis Ragsdale confessed to shooting Gibson. The videotaped statement was admitted for its truth: to demonstrate that Ragsdale was the one who shot and killed Gibson, and that he had not done so intentionally, but rather as a result of an alcohol-related altercation. Ragsdale had been acquitted of first degree (witness-elimination) murder and convicted of second degree murder.

The People then argued that since the videotaped statement was admitted to show that Ragsdale was responsible for the shooting of Gibson and that the shooting was not a witness-elimination murder, they should be permitted to submit rebuttal evidence to show that the defendant was "responsible" for the shooting of Gibson and that Ragsdale's statement did not preclude the defendant's "involvement." The Supreme Court ruled that the videotaped statement "opened the door" to rebuttal evidence and that the People would be permitted to challenge Ragsdale's credibility and to suggest that the shooting of Gibson was part of a larger crime. On their rebuttal case, the People submitted, inter alia, a report prepared in connection with Gibson's autopsy which showed that Gibson's death had been caused by a bullet that entered his lower back, traveled through his abdomen, and perforated his spleen, stomach, liver, and heart.

The jury returned a verdict finding the defendant guilty of the three counts of bribing a witness. The defendant was acquitted of the three counts of tampering with a witness in the third degree. The defendant was subsequently sentenced to three concurrent terms of imprisonment of 15 years to life.

Viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620 [1983]), I agree with my colleagues in the majority that it was legally sufficient to establish beyond a reasonable doubt the defendant's guilt with respect to the three counts of bribing a witness (*see* Penal Law § 215.00; *cf. People v Bac Tran*, 80 NY2d 170, 176 [1992]). Moreover, I also agree that the verdict of guilt was not against the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]; *People v Romero*, 7 NY3d 633 [2006]).

Nevertheless, the defendant is entitled to a new trial. "It is a general rule that it is error to receive evidence as proof of the offense charged that an accused has committed a criminal offense other than that charged in the indictment" (*People v Thompson*, 212 NY 249, 251 [1914]; *see* Jerome Prince, Richardson on Evidence § 4-501 [Farrell 11th ed, 2008 Supp]). "The rule excluding evidence of uncharged crimes is based upon the human tendency more readily 'to believe in the guilt of an

accused person when it is known or suspected that he [or she] has previously committed a similar crime' " (*People v Ventimiglia*, 52 NY2d 350, 359 [1981], quoting *People v Molineux*, 168 NY 264, 313 [1901]; *People v Allweiss*, 48 NY2d 40, 47 [1979]; *see People v Zackowitz*, 254 NY 192, 198 [1930]). It has been recognized that "[t]he natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge" (*People v Zackowitz*, 254 NY at 198 [internal quotation marks omitted]). Accordingly, although "[i]t may be logical to conclude from a defendant's prior crimes that he [or she] is inclined to act criminally," this evidence is nonetheless "excluded for policy reasons because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past" (*People v Arafet*, 13 NY3d 460, 465 [2009] [internal quotation marks omitted]; *see People v Giles*, 11 NY3d 495, 499 [2008]).

However, "[t]he rule does not prohibit the admission of evidence of other . . . acts . . . which reveal or suggest the defendant's commission of some other crime—when these acts have substantial probative value to prove the crime charged" (Jerome Prince, Richardson on Evidence § 4-501 [Farrell 11th ed, 2008 Supp]; *see People v Ventimiglia*, 52 NY2d at 359; *People v Allweiss*, 48 NY2d at 47). Evidence of such acts may be admissible where that evidence is "relevant because of some recognized exception to the general rule . . . for example, to show (1) intent, (2) motive, (3) knowledge, (4) common scheme or plan, or (5) identity of the defendant" (*People v Lewis*, 69 NY2d 321, 325 [1987]; *see People v Molineux*, 168 NY at 293).

"Even when admissible for such purposes, however, the evidence may not be received unless its probative value exceeds the potential for prejudice resulting to the defendant" (*People v Lewis*, 69 NY2d at 325; *see People v Cass*, 18 NY3d 553, 560 [2012]). "If the evidence is actually of slight value when compared to the possible prejudice to the accused, it should not be admitted, even though it might technically relate to some fact to be proven" (*People v Allweiss*, 48 NY2d at 47; *see People v Giles*, 11 NY3d at 499). Indeed, the Court of Appeals has "stressed, yet again, the obligation of trial courts to take special care to ensure not only that the evidence bears some articulable relation to the issue, but also that its probative value in fact warrants its admission despite the potential for prejudice" (*People v Bradley*, 20 NY3d 128, 134 [2012] [internal quotation marks omitted]).

"There is no litmus paper test for determining when the probative value of the evidence outweighs its potential for prejudice" (*People v Ventimiglia*, 52 NY2d at 359). "In final analysis the process is one of balancing in which both the degree of probativeness and the potential for prejudice of the proffered evidence must be weighed against each other" (*id.*). "Factors which play a part in measuring probative value are 'the degree to which the evidence persuades the trier of fact that the particular fact exists and the [logical] distance of the particular fact from the ultimate issues of the case' " (*id.*, quoting Dolan, *Rule 403: The Prejudice Rule in Evidence*, 49 So Cal L Rev 220, 233 [1976]). "On the issue of probative value, materiality and necessity are important" (*People v Ventimiglia*, 52 NY2d at 360 [internal quotation marks omitted]). "The court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference to prove the issue upon which it is offered, that it is offered on an issue material to the prosecution's case, and is not merely cumulative" (*id.* [internal quotation marks omitted]).

In sum, the determination of whether evidence of prior bad acts or uncharged crimes may be admitted in a particular case requires a two-part inquiry: "first, the proponent of the evidence must identify some material issue, other than the defendant's criminal propensity, to which the evidence is directly relevant; once the requisite showing is made, the trial court must weigh the evidence's probative value against its potential for undue prejudice to the defendant" (*People v Cass*, 18 NY3d at 560 [citation omitted]).

"Whether evidence of prior crimes may be admitted under the *Molineux* rule is a question of law, not discretion" (*People v Alvino*, 71 NY2d 233, 242 [1987]; *see People v McKinney*, 24 NY2d 180, 185 n 4 [1969]). "If the evidence of prior crimes is probative of a legally relevant and material issue before the court, and for that reason not automatically barred under the general rule, admissibility turns on the discretionary balancing of the probative value and the need for the evidence against the potential for delay, surprise and prejudice" (*People v Alvino*, 71 NY2d at 242; *see People v Agina*, 103 AD3d 739, 743 [2013]). Although a trial court enjoys "broad discretion" in deciding whether to admit evidence challenged as unduly prejudicial (*People v Cortez*, 22 NY3d 1061, 1079 [2014, Abdus-Salaam, J., concurring]), a court nevertheless commits legal error "[w]here [it] has abused its discretion or exercised none at all" (*People v Williams*, 56 NY2d 236, 239 [1982]; *see People v Cortez*, 22 NY3d at 1079; *People v Davis*, 44 NY2d 269, 275 [1978]).

Here, the clearest indication of the Supreme Court's determination as to the relevancy of Gibson's murder to the charged crimes is found in its instruction to the jury that the evidence of Gibson's murder was admitted for the purpose of explaining the complainants' state of mind and providing background for their participation in the state's witness protection program. It is true that the state of mind of each of the complainants was relevant to the charges of tampering with a witness in the third degree, since the People were required to show that the defendant attempted to instill fear in them (*see* Penal Law § 215.11; *People v Henderson*, 265 AD2d 573, 573-574 [1999]; *cf. People v Morris*, 82 AD3d 908, 908-909 [2011]). However, the People never sought to use evidence of Gibson's murder as a means of proving that the defendant had intimidated the complainants into changing their testimony or refusing to testify and, in any event, the evidence did not establish any such logical connection between that crime and crimes with which the defendant was charged.

Despite the intimations of the prosecution to the contrary, the evidence was inadequate to show that the defendant was in any way involved in Gibson's murder. Thus, to the extent that evidence of Gibson's murder was presented to the jury in an attempt to establish that the defendant attempted to instill fear in the complainants, it lacked any probative value since, aside from the prosecutor's improper remarks on summation, the defendant was not adequately linked to that act (*see People v Cook*, 42 NY2d 204, 208 [1977]; *People v Leon*, 121 AD2d 1, 9 [1986]; *see also People v Randolph*, 18 AD3d 1013, 1015-1016 [2005]; *People v Rivera*, 160 AD2d 267, 271-272 [1990]).

While this lack of a connection to the defendant affected the relevancy and probative value of the disputed evidence of Gibson's murder, it did not, as the People contend, render such evidence benign. To the contrary, in similar contexts, both this Court and the Court of Appeals have recognized the undue prejudice suffered by defendants through the admission of "highly inflammatory" evidence that is not directly attributed to the defendants, but is nevertheless admitted in the case against them (*People v Smith*, 52 NY2d 802, 803-804 [1980]; *see People v Martinez*, 253 AD2d 775, 775-776 [1998]; *People v Pascullo*, 120 AD2d 687, 689 [1986]).

Moreover, any inference that Gibson was killed in an attempt by the defendant to indirectly influence the complainants' conduct would have been speculative at best (*see generally People v Adames*, 52 AD3d 617, 619 [2008]). Indeed, Gibson was shot after the complainants had already changed their stories

and after their last contact with the defendant (*cf. People v Kyser*, 183 AD2d 238, 243 [1992]). In other words, since the alleged tampering and bribery of the complainants had already been accomplished at the time Gibson was shot, evidence of Gibson's murder simply did not tend to prove any material element in the case (*see People v Park*, 12 AD3d 942, 944 [2004]; *People v Foster*, 295 AD2d 110, 112-113 [2002]; *see also People v Bell*, 217 AD2d 585, 586 [1995]).

Nor was the disputed evidence rendered admissible on the ground that it completed the narrative or furnished background information. The talismanic invocation of these phrases as grounds for the admission of uncharged crimes has prompted the Court of Appeals to note that its use of these phrases in several decisions "should not be interpreted as automatically allowing the prosecution to introduce evidence of uncharged crimes merely because the evidence is said to complete the narrative or furnish background information" (*People v Resek*, 3 NY3d 385, 390 [2004]).

To be sure, "[i]n appropriate instances, evidence of uncharged crimes may be allowable as background or narrative because juries might 'wander helpless' trying to sort out ambiguous but material facts" (*id.*, quoting *People v Green*, 35 NY2d 437, 441 [1974]; *see People v Gleason*, 285 App Div 278, 281 [1954]). Here, however, Gibson's murder constituted an entirely separate event that occurred after the charged crimes were allegedly completed. Proof of Gibson's murder was not so interwoven with "the evidence on which the guilt or innocence of the defendant [would] be determined" that the jury required knowledge of the murder to make sense of the material facts of the tampering and bribery charges (*People v Gleason*, 285 App Div at 281; *see People v Stanard*, 32 NY2d 143, 146-147 [1973]). Indeed, when proof of the charged crime may be amply understood without resort to evidence of an uncharged crime, the Court of Appeals has rejected similar "completing the narrative" contentions as a matter of law, even in circumstances where the uncharged crimes were actually committed contemporaneously with the charged crimes (*see People v Resek*, 3 NY3d at 389; *People v Cook*, 42 NY2d at 208; *see also People v Foster*, 295 AD2d at 112-113).

It is apparent that evidence of Gibson's murder was not relevant to directly establish any of the elements of the charged crimes, nor was it warranted to explain evidence that was probative of the elements of the charged crimes. The prosecution nevertheless contended that the evidence of Gibson's murder was probative of the state of mind of each of the complainants to

explain why they changed their stories and to explain why they entered into the witness protection program.

However, evidence of the fact that the complainants entered into a witness protection program was itself improperly admitted. There was no reason why the jury needed to be informed, on the People's direct case, that the complainants had sought refuge in a witness protection program. By placing before the jury evidence that law enforcement deemed it necessary to take the unusual step of affording the complainants near-constant protection, the jury was improperly invited to speculate as to the source of this threat to their safety (*see People v Spence*, 92 AD3d 905, 905-906 [2012]; *People v Leon*, 121 AD2d at 9-10). In sum, the need to explain why the complainants were placed in the witness protection program was a self-created problem that stemmed from the improper admission of the witness-protection evidence in the first place (*see People v Spence*, 92 AD3d at 905-906; *People v Leon*, 121 AD2d at 9-10). It can hardly be said that such evidence was a "necessity" to the People's case (*People v Ventimiglia*, 52 NY2d at 360 [internal quotation marks omitted]).

The People nevertheless contend that defense counsel "opened the door" to the admission of the witness-protection evidence by (1) examining the complainants' relocation files in preparation for the trial and (2) failing to represent to the trial court that she would not make use of the information contained in those files. These arguments, cited by my colleagues in the majority, would represent a significant expansion of existing law by recognizing that a defense attorney may open the door to otherwise inadmissible evidence before the trial even begins simply by investigating or familiarizing himself or herself with the facts surrounding the case or by exploring possible avenues of impeachment of likely witnesses. This position, if accepted, would also appear to place a burden on a defense attorney to affirmatively certify to a court that he or she will not pursue certain trial strategies before the trial has begun, thereby forcing a defendant to choose among available trial tactics before the People even begin to put on their case. There is no need for any such expansion of the already nebulous "opening the door" jurisprudence, and there has been no citation to any legal authority to support these positions.

Furthermore, since the prosecution did not adequately link the defendant to Gibson's murder, it could not have served to show that the defendant intended to instill fear in the complainants (*see People v Smith*, 52 NY2d at 803-804; *People v Martinez*, 253 AD2d at 775-776; *People v Pascullo*, 120 AD2d at 689; *cf.*

*People v Tas*, 51 NY2d 915, 916 [1980]). Indeed, any generalized fear experienced by the complainants that was unattributable to the defendant was not relevant to any material element of the crimes charged. General, nonattributable fear experienced by the complainants as a result of the Gibson murder could only have been relevant to the complainants' general credibility.

It has been recognized, primarily in other contexts, that evidence of uncharged conduct may be probative where it is "directly bearing on the motive to testify of a critical witness in a criminal trial, whose motive is important to an evaluation of her credibility" (*People v Beckles*, 128 AD2d 435, 439 [1987]; *see People v Anonymous*, 275 AD2d 210, 212 [2000], *affd* 96 NY2d 839 [2001]; *People v Folk*, 176 AD2d 754, 754-755 [1991]). Here however, the complainants did not testify that their decision to retract their recantations was motivated by their knowledge of Gibson's murder. There was no direct proof establishing that Gibson's murder played any role in the complainants' decision to testify in the way that they did (*cf. People v Anonymous*, 275 AD2d at 212; *People v Folk*, 176 AD2d at 754-755). My colleagues in the majority do not conclude otherwise, instead finding that a motivating factor behind the complainants' decision to testify could "reasonably be inferred" from the evidence of Gibson's murder.

Even if the evidence of Gibson's murder was inferentially probative of the complainants' motive to testify, it was nevertheless error to admit it. To begin, the evidence was improperly admitted during the People's case-in-chief (*cf. People v Edwards*, 261 AD2d 260, 261 [1999]; *People v Pondexter*, 215 AD2d 409, 410 [1995], *revd on other grounds* 88 NY2d 363 [1996]; *People v Wilson*, 195 AD2d 493, 493-495 [1993]; *People v Rivera*, 160 AD2d 267, 271 [1990]; *People v Burke*, 128 AD2d 542, 543 [1987], *affd* 72 NY2d 833 [1988]; Jerome Prince, Richardson on Evidence § 6-415 [Farrell 11th ed, 2008 Supp]). The evidence of Gibson's murder was not made in response to an attack on the credibility of the complainants or to fully explain a matter to which the defendant had " 'open[ed] the door' " (*People v Melendez*, 55 NY2d 445, 451 [1982]). Rather, the Supreme Court's ruling on this matter occurred before the trial even began. In this way the People were permitted to adduce evidence of Gibson's murder on their direct case, effectively bolstering the credibility of their own witnesses before they were attacked in cross-examination (*cf. People v Trowbridge*, 305 NY 471, 477 [1953]), notwithstanding that "enhancement of the complaining witness's credibility [is not] one of the recognized exceptions to the *Molineux* rule" (*People v Harris*, 150 AD2d 723, 725 [1989]).

This error does not represent some technical violation of timing, since by permitting this preemptive bolstering, the court effectively deprived defense counsel of a whole range of strategic options as to how to defend against the charges of witness tampering and bribery. As a result, defense counsel was forced to address the issue from the outset of the case and engage in the difficult task of defending against the implication of complicity in an uncharged murder.

It is for this reason that the People's repeated contention that defense counsel opened the door to such evidence must fail. Defense counsel's reference in her opening statement to other witnesses to the Sykes murder and her cross-examination of the complainants as to matters concerning the relocation program occurred after the trial court, reversing its earlier ruling, permitted the People to introduce evidence of Gibson's murder and the complainants' relocation on their direct case. The People, in effect, seek to justify the admission of the evidence "on the ground that the reception of the evidence was in some way validated after the event" (*People v Liller*, 26 AD2d 983, 985 [1966, Gibson, P.J., dissenting], *revd on dissenting op* 20 NY2d 727 [1967]). "Surely, however, it cannot be that defendant had to remain mute after the introduction, over his proper objection, of a mass of damaging and prejudicial evidence as part of the People's case" (*People v Liller*, 26 AD2d at 985). Defense counsel's decision to cast the improperly admitted evidence in the best possible light for her client did not retroactively serve to justify its admission in the first place (*see People v Liller*, 20 NY2d 727 [1967]).

Even assuming that the evidence of Gibson's murder was inferentially probative of the complainants' credibility, this finding by the trial court would only represent the first step in the two-step determination. As previously noted, once the proponent of the evidence identifies "some material issue . . . to which the evidence is directly relevant . . . the trial court must weigh the evidence's probative value against its potential for undue prejudice to the defendant" (*People v Cass*, 18 NY3d at 560 [citation omitted]).

Here, the Supreme Court failed to either evaluate the potential for undue prejudice to the defendant or weigh it against the probative value of the evidence to the charged crimes. Indeed, "the record shows that the court ended its inquiry at relevance without addressing those other important considerations" (*People v Cortez*, 22 NY3d at 1080). This failure to exercise its discretion constituted error as a matter of law (*see id.* at 1079; *People v Williams*, 56 NY2d at 239-240; *People*

*v Davis*, 44 NY2d at 276; *People v Martinez*, 253 AD2d at 776; *People v Perkins*, 246 AD2d 608, 608 [1998]; *People v Mitchell*, 209 AD2d 443, 443-444 [1994]; *People v Celestino*, 201 AD2d 91, 96 [1994]; *People v Brown*, 194 AD2d 443, 444 [1993]; *People v Moore*, 156 AD2d 394, 394-395 [1989]).

In the event that the discretionary balancing had been performed by the trial court, or is performed post facto by this Court, any probative value resulting from an inference that could be made regarding the complainants' general credibility was vastly outweighed by the potential for undue prejudice to the defendant. In this regard, it has been recognized that "[t]here is an obvious, and unusual, potential for unfairness in allowing a witness whose credibility is under challenge to buttress his or her own credibility by attributing to the defendant shocking criminal behavior on the claim that such behavior influenced the witness to testify" (*People v Beckles*, 128 AD2d at 439). Accordingly, even where a victim has explicitly testified that the defendant's commission of an uncharged crime was the motivating factor behind his or her decision to come forward, it has been held that the probative value of such evidence was outweighed by the prejudice it would inflict on the defendant (*see People v Park*, 12 AD3d at 944; *People v Beckles*, 128 AD2d at 439). Under such circumstances, there is simply "no compelling probative need for introducing evidence with such an enormous potential for prejudice" (*People v Beckles*, 128 AD2d at 439; *see People v Park*, 12 AD3d at 944).

The People's contention that the defendant was not prejudiced by the evidence of Gibson's murder since he was not directly linked to that crime is without merit and belied by the prosecutor's own comments during summation during which he utilized the testimony that he had elicited on his direct case to urge the conclusion that the defendant was responsible for Gibson's murder. In any event, the fact that the evidence did not directly link the defendant to Gibson's murder "resulted in an implicit invitation to the jury to speculate" that the defendant committed, or was responsible for, that crime (*People v Rivera*, 160 AD2d at 272). In this regard, the Court of Appeals has noted, "to the extent that the evidence of defendant's identity as the perpetrator of the uncharged crime is unclear . . . the case becomes a trial within a trial which may result in jury confusion" (*People v Robinson*, 68 NY2d 541, 550 [1986] [footnote omitted]).

The recognized danger of subjecting a defendant to a trial within a trial was fully realized in this case. Far from completing the narrative of the events that transpired, the admission of

the evidence of Gibson's murder diverted the jury's attention from the actual crimes charged and left the jury to speculate about the defendant's role in that shooting. The record demonstrates that the entire trial was so permeated with references and evidence relating to Gibson's murder that it became a mini-murder trial in and of itself. The jury was informed of Gibson's murder during jury selection and the prosecutor referred to it in his opening statement, pointedly noting at one point that "[t]here's no evidence *that you're going to hear* that [the defendant] was anywhere near that location" where Gibson was shot (emphasis added). No fewer than six witnesses testified about Gibson's murder, a topic which filled over 100 pages of the trial transcript and which was raised on over 80 separate occasions throughout the course of the trial. The prospect for jury speculation compelled the defendant to introduce evidence in an attempt to prove that he was innocent of the uncharged crime. The People were then permitted to attack the credibility of the individual convicted of the Gibson murder and to admit medical evidence pertaining to Gibson's gunshot wound. Finally, the prosecutor, in his summation, explicitly cultivated jury speculation and tacitly solicited the very prejudice that the *Molineux* rule is designed to prevent, stating, among other things, "Why did this murder happen the weekend before the witness was supposed to testify? And this is the thing, you can speculate all you want . . . you can say hey, [the defendant] reached out to three witnesses and a fourth one got killed on that weekend, a person that [one of the complainants] said [the defendant] wanted to talk to."

The unfortunate manner in which the trial spun out of control was born of the trial court's error in permitting evidence of the uncharged crime to be admitted during the People's direct case. The impact of this error on the trial was not eliminated by the court's instruction to the jury that "this defendant . . . has not been charged with causing the death of the witness Bobby Gibson. The People have introduced evidence regarding Mr. Gibson's death for the purpose of explaining the state of mind of the three complainants . . . and to provide the background for their participation in the witness protection program of the District Attorney's office." The instruction merely stated that the defendant had not been *charged* with Gibson's murder, thereby inviting retribution from the jury if it speculated that the defendant was responsible for Gibson's murder, but had somehow avoided prosecution for that crime.

It is also notable that the jury was not instructed as to what limited purpose it could use the evidence of the uncharged crime

(*cf. People v Rivera*, 160 AD2d at 271-272). That limited purpose was far from apparent, as evinced by the People's labored attempts to articulate justification for the trial court's ruling and the lengthy legal analysis necessitated on this appeal.

The temptation to speculate as to the defendant's involvement in Gibson's murder must be overwhelmingly evident to any reader of the facts of this case. As recognized by the Court of Appeals in a similar context, "while it was not difficult to construct a superficially convincing narrative based on this propensity driven supposition, it is precisely such a carelessly constructed yet highly seductive narrative that the *Molineux* doctrine prudently excludes from a criminal trial" (*People v Cortez*, 22 NY3d at 1071-1072 [Lippman, Ch. J., concurring]).

"[T]he more heinous the uncharged crime, the more likely that jurors will be swayed by it, and the difficulty faced by the defendant in seeking to rebut the inference which the uncharged crime evidence brings into play" (*People v Robinson*, 68 NY2d at 549). The evidence that one of the complainants' fellow witnesses had been murdered "added facts involving the defendant and others in a web of activity which could only be considered by the jury reprehensible" (*People v Stanard*, 32 NY2d at 147). The prejudice suffered by the defendant in this case cannot be distilled into a single trial error grounded in State evidentiary law or relegated to harmless error analysis, for it cascaded into every facet of the trial and infected the very fabric of the process. Where, as here, trial error has "operated to deny an[ ] individual defendant his [or her] fundamental right to a fair trial, the reviewing court must reverse the conviction and grant a new trial . . . without regard to any evaluation as to whether the errors contributed to the defendant's conviction" (*People v Crimmins*, 36 NY2d 230, 238 [1975]; *see People v Mees*, 47 NY2d 997, 998 [1979]). "Not only the individual defendant but the public at large is entitled to assurance that there shall be full observance and enforcement of the cardinal right of a defendant to a fair trial" (*People v Crimmins*, 36 NY2d at 238). "The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" (*id.*).

A defendant should only be compelled to defend against the crimes for which he was charged. Accordingly, I vote to reverse the judgment and order a new trial on the counts of the indictment charging the defendant with bribing a witness.