THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE LEON, Appellant.

First Department, December 2, 1986

## APPEARANCES OF COUNSEL

*Andrew C. Fine* of counsel *(Sheila A. Murphy* with him on the brief; *Philip L. Weinstein,* attorney), for appellant.

*Michael R. Gordon* of counsel *(Billie Manning* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

WALLACH, J.

Appellant stands convicted of murder in the second degree. He urges reversal on the ground that the People's chief witness, Israel Rivera, was an accomplice, and that the jury

should therefore have been instructed that his testimony had to be corroborated, even though no request was made for such an instruction and no exception taken to its omission. At the least, appellant argues, Rivera's status as an accomplice should have been submitted to the jury as an issue of fact. Appellant also argues that error was committed when a second prosecution witness was permitted to testify on redirect examination that he had received a threat warning him not to testify in this case.

Israel Rivera is a self-described member of the Scorpions, an "auto club" in The Bronx, and is known as their "godfather". He testified that on March 18, 1984, at approximately 11:00 P.M. to 12:00 A.M., he was driving a 1973 Buick with five of his fellow Scorpions inside as passengers, namely, appellant, appellant's codefendant, Ray Vadell, and three others whose names were Lopez, Tomas and Ephraim. The car belonged to Ephraim, who told Rivera to drive. They had all been drinking beer for a number of hours and were now in search of a bodega to replenish their supply. Rivera drove to a first bodega, but it was closed, so he drove on to another where they met the decedent, Alberto Marrero. Marrero was not a Scorpion, but he lived in Rivera's neighborhood, and was friendly with Rivera and Vadell. Marrero voluntarily got into the back seat, and accompanied the six Scorpions to a third bodega on Southern Boulevard. Appellant went inside to buy an eight-pack of beer, which they drank while listening to music. After this, Rivera drove toward "Fairmont", where the Scorpions maintained a lot or garage for auto repairs. However, as they were heading up the hill towards Fairmont, appellant told Rivera to turn left, which he did. Appellant and Tomas told Rivera to park in front of a school located near Crotona Park, saying they wanted to burglarize it, and then told Marrero to get out of the car.

Marrero, Tomas and appellant, who was carrying a baseball bat, got out of the car and began to cross the street, leaving behind Rivera, Lopez and Vadell in the front seat of the car, and Ephraim in the back. Through the sideview mirror, Rivera, to his surprise, saw appellant hit Marrero on the back of the head with the bat when the three were approximately three car lengths away. Marrero fell, and Tomas, accompanied by appellant, dragged him into a nearby alleyway, where they disappeared from Rivera's sight. After appellant and Tomas were in the alley for approximately 15 minutes, Ephraim got out of the car carrying his "puniard", a six-inch knife with a

case, and went into the alley. Approximately five minutes later, Ephraim, with his now bloody knife, returned to the car where Rivera, Lopez and Vadell sat, still drinking beer.

Ephraim told Lopez that "he had to take part in it," so Ephraim walked Lopez back to the alley, where appellant, Tomas and Marrero remained. Ephraim did not tell Rivera or Vadell that they, too, had to join in. Five minutes later, Lopez returned, screaming, "They killed that man over there". Lopez was closely followed by appellant, Tomas and Ephraim. Since appellant's shirt was bloody and the other two also had blood on them, Rivera did not have to ask what had happened; he "knew what had happened". Rivera and Vadell were in the car during the entire incident, and did not take part in it.

After appellant removed his bloody shirt and got back into the car, the six drove off, appellant, Tomas and Ephraim in the back, Lopez and Vadell in the front with Rivera behind the wheel. Along the way, either appellant or Tomas told Rivera to stop the car, whereupon the bat was thrown down a sewer by 1 of the 3 who were sitting in the back. They then proceeded to drive around Crotona Park, but, approximately 15 minutes after they left the school, Vadell said he wanted to "check up to see if it was true that [Marrero] was dead or alive". At some point between leaving and returning to the schoolyard, appellant and Tomas said that if anyone talked "they would get the same thing". When they got back to the schoolyard, Rivera remained inside the car, and the others got out. Vadell, who was carrying the knife attached to a stick that he always carried, went into the alleyway, while the others stayed by the car. Shortly thereafter, Vadell returned to the car unbloodied, and said, "now, I am sure that he is dead". The group then drove off.

Approximately two months after the incident, Rivera was arrested for Marrero's murder, along with appellant, Ephraim and Lopez, and questioned by the District Attorney. Thereafter, Rivera testified before the Grand Jury. Although never indicted, the People refused at appellant's trial to stipulate that Rivera is immune from prosecution as a matter of law.

By an indictment filed on May 21, 1984, appellant, Vadell and Lopez were charged with one count of murder in the second degree, "each aiding the others and acting in concert with other persons". Appellant and Vadell made a joint motion to sever their trial from Lopez', which was granted. Lopez was tried, convicted of assault in the third degree and

sentenced to time served. Vadell, tried jointly with appellant, was convicted of manslaughter in the first degree, and sentenced as a second felony offender to an indeterminate term of imprisonment of from 10 to 20 years. His conviction was reversed on appeal, a new trial being ordered on the ground that the prosecutor had improperly elicited hearsay evidence against him *(People v Vadell,* 122 AD2d 710).

Tacitly recognizing that the record does not indisputably establish advance knowledge on Rivera's part that the others were going to attack Marrero, appellant argues that Rivera became an accomplice as a matter of law when, knowing of the attack, he drove back to the schoolyard at Vadell's request. This, says appellant, aided Vadell, who wanted to make sure of Marrero's death, and establishes direct participation by Rivera in the offense charged (CPL 60.22 [2] [a]; Penal Law § 20.00). Even before that, appellant argues, Rivera became an accomplice as a matter of law when, with knowledge of the attack on Marrero, he assisted the group by driving it away from the scene and then stopping the car by a sewer in order to give them an opportunity to dispose of the bat. This, says appellant, made Rivera liable for hindering prosecution in the first degree (Penal Law § 205.65). Finally, appellant argues that even if Rivera cannot be deemed an accomplice as a matter of law, his status as an accomplice was, at the least, an issue of fact that should have been left to the jury to decide. In this regard, appellant questions whether Rivera would have observed appellant, Tomas and Marrero through the sideview mirror had he not known in advance what appellant and Tomas were about to do. Appellant also questions why Rivera was merely "surprised", not shocked, by what he saw.

The People argue that Rivera was nothing more than an "unfortunate witness", whose presence at the scene was entirely innocent and nonindicative of a criminal intent. They point out that Rivera's testimony—and there was none to contradict it—was all to the effect that he had no advance knowledge that Marrero was to be killed; that he was driving Ephraim's car only because told to do so; that he veered off at the schoolyard and stopped the car there because told to do so; that he stopped the car by the sewer where the bat was discarded because told to do so; and that he drove back to the schoolyard because told to do so by Vadell.

Accomplice testimony involves the risk of motivated fabrication and is inherently suspect, especially when exchanged for immunity or other favorable prosecutorial consideration—

hence the need for corroboration *(People v Berger,* 52 NY2d 214, 218-219; *People v Cona,* 49 NY2d 26, 35-36; *People v Hudson,* 51 NY2d 233, 238). CPL 60.22 defines an accomplice as a witness who, upon the basis of evidence adduced at the trial, may reasonably be considered to have participated in the offense charged, or an offense based upon the same or some of the same facts or conduct which constitute the offense charged *(People v Basch,* 36 NY2d 154, 156-157). If the undisputed evidence establishes that a witness is an accomplice, the jury must be so instructed *(supra),* and the failure to do so upon request necessarily constitutes harmful error *(People v Minarich,* 46 NY2d 970). If different inferences can reasonably be drawn from the proof regarding complicity, the question should be left to the jury *(People v Basch, supra),* and the failure to do so upon request constitutes harmful error unless corroborative proof adduced at the trial overwhelmingly points in the direction of the defendant's guilt *(People v Crimmins,* 36 NY2d 230, 241-242; *see, People v Werner,* 55 AD2d 317, 321; *People v Ramirez,* 94 AD2d 965). The People do not argue, and we are aware of no case law holding, that different principles apply where, as here, the failure to charge the accomplice-corroboration rule has not been preserved as a question of law pursuant to CPL 470.05 (2) *(see, People v Ramos,* 68 AD2d 748, 753-754; *People v Johnson,* 6 AD2d 181; *People v Bell,* 32 AD2d 781; *cf. People v Spiegel,* 60 AD2d 210, 212-213, *affd* 48 NY2d 647).

We hold that when the case against the defendant rests substantially on the testimony of a witness who is an accomplice as a matter of law, or who may be one as a matter of fact, it is best that the court offer to charge the accomplice-corroboration rule if not requested by the defendant. Should the defendant then reject the offer, his failure to request the instruction or object to its omission will more readily appear as a deliberate trial tactic, and interest of justice review pursuant to CPL 470.15 (6) will be virtually foreclosed *(see, People v Johnson, supra,* Valente, J., dissenting).

We do not agree with appellant that Rivera was an accomplice as a matter of law. His actions in stopping the car by the sewer where the bat was discarded, and in driving the group back to the schoolyard when told to do so by Vadell, are as consistent with an inference that he feared the same would happen to him as happened to Marrero, as with an inference that he intended to aid the criminal enterprise. One is not to be deemed an accomplice merely because, acting out of fear,

he in some way aids the commission of a crime *(People v Jackerson,* 247 NY 36, 42).

We do find, however, that Rivera was sufficiently identified with the commission of the crime, and that the risks addressed by the accomplice-corroboration rule are sufficiently implicated, to have warranted the submission of his accomplice status to the jury as an issue of fact. According to the People, six gang members were at the scene of the crime, and only one, Rivera, their witness, had nothing to do with it. He was present throughout the course of the criminal enterprise, and indeed aided its commission by driving the car *(see, People v Bell, supra).* True, he never stepped out of the car, but, as the "godfather" of the Scorpions, the jury might have inferred that he was a leader of the gang, and, as the People argued with respect to Vadell, thus not expected to "dirty his hands". Finally, Rivera did not come forward with his account of the events implicating the others until arrested for Marrero's murder in May 1984, along with appellant, Ephraim and Lopez. Perhaps he did not come forward out of fear; then again, perhaps he did not come forward because he was an accomplice, and only decided to talk, and go before the Grand Jury, in the hope of gaining immunity.

The only other evidence offered by the People connecting appellant to the crime was the testimony of Charles Betancourt, another Scorpion, which was, to say the least, far from overwhelming. He testified that several hours after he himself was questioned by the police about the murder, he met appellant, and, having heard rumors, asked him whether it was true that he killed Marrero, to which appellant responded in the affirmative. However, when confronted with his Grand Jury testimony on cross-exmination by appellant's attorney, Betancourt was not able to recall whether appellant had actually responded to his inquiry. Then, on cross-examination by Vadell's attorney, Betancourt again stated that appellant admitted the murder. Betancourt waffled on other subjects as well. Even the prosecutor felt a need to explain Betancourt's inconsistencies by suggesting to the jury in his summation that he may have been "a little nervous". We are persuaded that the chances that appellant would have been convicted on the basis of Betancourt's testimony alone were at best minimal.

But, quite aside from the question of whether the record contains evidence indicative of Rivera's complicity and, if so, whether it contains evidence, apart from Rivera's testimony,

overwhelmingly indicative of appellant's guilt, is whether the People did not themselves regard Rivera as an accomplice. The People should not be heard to argue on appeal that Rivera was not an accomplice having presented their case to the jury on the theory that he was. A few excerpts from the prosecutor's summation illustrate the tenor of his argument:

"Alberto Marrero was taken to the schoolyard for one purpose and one purpose only. He was taken there to be killed and he was killed and *everybody who went to that schoolyard knew what was going on back there.*

"I do not know about the existence of any agreements because obviously if there were agreements they were between Scorpions, who are not likely to tell us. Can we honestly believe that nobody in that car knew what they were going to do? Why take him to the schoolyard? Why take him to this dark and secret place unless they were going to kill him. *They didn't want any witnesses.*

"You're going to be told what acting in concert means. It does not matter if one gang member did a lot or a little. *They shared the same purpose.* It would be ridiculous to assume that *these people* did not know what was going on.

"You must rely on your common sense. You must rely on what you know of the world. *These people killed Alberto Marrero* and the evidence is more than sufficient to support that.

"There is no lack of evidence. At this point, I'll ask you to think carefully, use your common sense. You'll see that the only logical explanation, the only logical explanation is that *these Scorpions set out to kill Alberto Marrero. They intended to do it, and they did cause his death."* (Emphasis added.)

We do not mean to take the prosecutor's comments out of context. The remarks quoted above were meant to convince the jury that Vadell, appellant's codefendant and the alleged leader of the Scorpions, should be found guilty of murder even though his conduct, as described by Rivera, might be viewed as more attenuated from the acts of violence which caused Marrero's death than that of the other four Scorpions who initially stepped out of the car. But, in making his case against Vadell, the prosecutor found it necessary to suggest to the jury that what took place here was a street-gang murder, with all of the members of the gang present on the scene acting in concert. Reading the prosecutor's summation in its entirety, we think it fair to say that the indiscriminate "they"

to which he made repeated references could have been understood by the jury to include Rivera. This much is certain: nowhere did the prosecutor make any specific references in his summation to Rivera's explicit denial of knowledge that he was transporting Marrero to his death, or otherwise bring home to the jury Rivera's noncomplicity.

Having heard these comments, the jury may have been left with the impression that Rivera's status as an accomplice was either an established fact or a matter of no particular consequence. The duty then rested on the Trial Judge to offer to instruct the jury otherwise; that an accomplice's testimony is indeed a matter of very special concern, so much so that it alone cannot support a guilty verdict. We hold that the failure to do so requires a new trial in the interest of justice.

■ There is also merit to appellant's second point. Betancourt testified to an admission made to him not only by appellant, but also to one made by Vadell. On cross-examination, Vadell's attorney brought out that in December 1984, Vadell's wife went to the police and accused Betancourt of having raped the Vadells' four-year-old daughter. It was also brought out that, at that time, Betancourt was living in abandoned buildings, and not, as he had been, next door to the Vadells for whom he babysat on occasion. Vadell's attorney then asked Betancourt to admit that he was living in abandoned buildings because he was hiding from the police, and was also afraid that Vadell would avenge the rape of his daughter. "[T]hat's why you want to keep Ray in jail, so he doesn't come out and beat you up or hurt you, 'cause you did that?" Betancourt denied the rape, and was equivocal as to whether he feared Vadell, but the jury was certainly left to ponder whether fear of Vadell might not be motivating Betancourt to testify falsely against him. On redirect, over both defendants' objection and motion for a mistrial, Betancourt explained that his flight and nomadic life-style were motivated by the fear he felt when an anonymous note was slipped under his door threatening to cut out his tongue if he testified in this case. In this way the People attempted to show that Betancourt was hiding not from the police, or from Vadell, for having raped Vadell's daughter, but from whomever it was that threatened him with mayhem.

Admission of this testimony was error in the absence of any evidence connecting appellant to the threat. It is true that Betancourt was impeached on cross-examination in the sense that the jury was left to ponder whether fear of Vadell

might not give him a motive for preferring to see Vadell remain safely under lock and key. The subsequent admission of the threat on redirect examination did not dispel this inference of fear and bias, but, on the contrary, could only have reinforced it—at best, from the People's point of view, the jury could have concluded that Betancourt was not a child rapist who was in fear of Vadell, but the victim of a threat who was in fear of all of the Scorpions, still acting in concert as of December 1984. To assume, as the People do, that the jury accepted the threat as coming from some third person unconnected with Vadell and appellant, is to assume too much, particularly in the absence of an instruction from the court limiting the relevancy of the threat to the reasons for Betancourt's seemingly fearful behavior. Thus, the jury was left free to speculate whether appellant, if not himself the author of the note, did, as a member of a ruthless street gang, inspire and contrive its delivery with others. The prejudice caused appellant by the introduction of this evidence far outweighed any rehabilitative value it might have had on Betancourt's credibility, and, therefore, it should not have been admitted (see, People v Melendez, 55 NY2d 445, 452-453).

Accordingly, the judgment of the Supreme Court, Bronx County (Joseph Mazur, J.), rendered June 7, 1985, which convicted defendant, after a jury trial, of murder in the second degree, and sentenced him to a prison term of from 25 years to life, should be reversed, on the law, and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.

MURPHY, P. J., ROSS and LYNCH, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on June 7, 1985, unanimously reversed, on the law, and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.