■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LARRY BECKLES, Also Known as LARRY GREEN, Appellant.— Judgment, Supreme Court, New York County (Clifford Scott, J.), rendered August 5, 1985, which convicted defendant, after a jury trial, of murder in the second degree and sentenced him to an indeterminate term of imprisonment of from 25 years to life, reversed, on the law, the judgment of conviction is vacated, and the case is remanded for a new trial.

Defendant was convicted after a jury trial of murder in the second degree and sentenced to an indeterminate term of imprisonment of from 25 years to life. Although the evidence strongly supports the jury's verdict, the conviction must be reversed and the case remanded for a new trial because the defendant's right to a fair trial was violated by the extensive, and unjustified, introduction of evidence relating to his in-

volvement in uncharged crimes, including unrelated murders and robberies.

As to that part of the trial in which evidence of uncharged crimes was developed in the most detailed and systematic way, we acknowledge that a plausible argument has been presented that the evidence was relevant to the motive of the principal witness against defendant to testify against him, and that the motive of that witness to testify was a central issue in the case. Even as to that part of the disputed evidence, however, we think it clear that the evidence of uncharged crimes elicited went well beyond that which was even arguably justified. Indeed, under the circumstances of the case it seems to us doubtful, under the well-established balancing test, that there was a sufficient prosecutorial need to justify the introduction of any of the evidence. Moreover, the record discloses that at various other points, evidence of uncharged crimes, and closely related material of a highly prejudicial character, was introduced without any justification, or under circumstances in which the purported justification was clearly insufficient.

Sheila Dawn Wilson, the principal prosecution witness in this case, met the defendant on May 22, 1984 and, shortly thereafter, moved with him into an apartment at 101st Street and First Avenue. As described by the witness in testimony to which there was no objection, the defendant frequently beat her, threatened her with knives, and told her that he would kill her and hurt her family if she ever left him. The most recent beating prior to the events with which we are concerned occurred on November 23, 1984, when the defendant struck her on the head. Wilson went to Harlem Hospital, but left after several hours. She then looked for and found the defendant, and spent the evening with him drinking, arguing and attending a party at a friend's apartment.

In the early morning of November 24, 1984, Wilson and the defendant were standing outside a storefront on Lenox Avenue between 118th and 119th Street, when a dark-skinned young man, wearing a dark, hip-length, hooded coat, approached and spoke to the defendant. The defendant removed a $50 bill and other bills from his wallet and gave them to the other man, saying to him, "Do it right, Home Boy, do it good, Home Boy." The defendant and the man slapped hands high in the air, and defendant told him that he would "give him the rest later on."

The man to whom the defendant gave the money crossed

the street and approached Kevin Byrd, who was standing with his girlfriend's aunt. He shot Byrd in the head, and then fired two additional shots. Shortly thereafter, a police officer found Byrd lying on the ground bleeding heavily from the head. The police officer obtained a description of the shooter, who, among other details, was described as wearing a hooded, three-quarter length, blue coat.

When Wilson saw the man to whom defendant had given money shoot Byrd, and saw Byrd fall to the ground, she ran to a phone booth and dialed 911. The defendant grabbed the phone from her. Wilson then ran to a second phone booth at 125th Street near Lenox Avenue and again called 911, requesting the operator to send a police car. Defendant and the police arrived simultaneously, and defendant asked Wilson to go with him. Instead, she went into the police car, and the defendant left.

Wilson told the officers about the shooting, and at her request was taken to Harlem Hospital where she again called 911, and asked to speak to a named detective. She was picked up at the hospital and brought to the precinct, where she first told two officers, and then Detective Maurice Colbert, what had occurred. She then went to her mother's hotel room. The following day defendant came to the hotel room and Wilson left with him and thereafter continued their relationship.

Several days after the homicide the defendant told Wilson that the dead man's name was Kevin, and that he had him killed because he had switched drugs the defendant had given him to sell. The defendant said the killer's name was "Ice", and said that if she went to the police "he'd put a cap in [her] head, too."

The defendant was arrested on February 19, 1985, following an anonymous telephone tip. After receiving *Miranda* warnings, he admitted knowing Byrd and eventually said that he had seen three men do the shooting. He also said that Wilson had been with him at the time of the shooting.

The most detailed development of evidence of uncharged crimes allegedly committed by the defendant occurred during the redirect examination of Wilson. It was the District Attorney's claim, accepted by the trial court over timely and repeated objections by defense counsel, that the cross-examination of the witness "had opened the door" to the introduction of evidence of other crimes.

During the cross-examination, defense counsel undertook to develop two reasons why Ms. Wilson would falsely accuse the

defendant of the crime with which he was charged. First, and not relevant to the appellate issue presented, he asked her whether or not she was not jealous of the defendant's relationship with another woman. Second, and giving rise to the purported basis for what occurred on the redirect examination, he questioned her as to whether or not she was not trying to revenge herself on the defendant because of the repeated beatings that he had inflicted on her.

In response to a question as to whether her testimony would "be a way to get back to Mr. Beckles", the witness responded: "I feel like this. Somebody has got to close the door on a person that is constantly murdering, constantly robbing people, constantly beating people." Not objecting to what would appear to have been an unresponsive answer, defense counsel asked the witness whether her testimony was not a way of fighting back against defendant, and whether or not her intention was to put him in jail so that he would not have a chance to beat her up again. To this she responded: "No, no, so he won't have a chance to kill me."

Contending that the cross-examination "had opened the door", the District Attorney elicited on redirect examination that the defendant had told the witness of a number of other crimes that he had committed, including murders and robberies, and that she herself had witnessed some of these. In particular, she testified that he specialized in the robbery of elderly men "because they cannot fight, they cannot defend themselves", and reported the defendant telling her of how he had beaten one person with an iron pipe. In addition, she testified that he had told her of killing a friend of his named Al "[B]ecause he owed him some money * * * And threatened to tell this other lady that me and him was together."

The principle is, of course, well established that evidence of uncharged crimes and offenses is inadmissible if offered to establish a defendant's criminal predisposition. (See, e.g., People v Molineux, 168 NY 264; People v Zackowitz, 254 NY 192; People v McKinney, 24 NY2d 180; People v Ventimiglia, 52 NY2d 350.) Where, however, evidence of such crimes is probative of an issue in the case, the admissibility of such evidence turns on whether the appropriate probative value of such evidence outweighs its prejudicial effect. (See, e.g., People v Ventimiglia, supra, at 359.)

Undeniably, Ms. Wilson was the critical witness in this case and the reliability of her testimony presented the central issue at trial. Her motivation in informing the police of the

defendant's involvement in the murder, and in then testifying against him, clearly presented an important jury question, and there can be no doubt that defense counsel undertook to establish that she had a motive to accuse the defendant falsely of the crime. The principal justification urged for admitting, on redirect examination, detailed evidence of uncharged crimes is the claim that the witness was testifying against the defendant, not merely because she had observed a shocking crime occur in her presence, but in part at least because the crime she witnessed was only the last of a number of crimes that he had committed, and that she felt an obligation to put an end to this ongoing course of criminality.

The probative purpose advanced in support of the commission of other crimes during her redirect examination does not, of course, fall within any of the familiar *Molineux* exceptions to the rule against allowing evidence of uncharged crimes. However, the principle is now well established that the *Molineux* group of exceptions is illustrative only and that, subject to the balancing test, evidence of uncharged crimes may be admitted if the evidence serves an appropriate probative purpose. *(See, People v Ventimiglia, supra; People v Jackson,* 39 NY2d 64, 67, 68.) In principle, there appears no compelling reason why such evidence directly bearing on the motive to testify of a critical witness in a criminal trial, whose motive is important to an evaluation of her credibility and has been put directly in issue on cross-examination, may not be considered as serving an appropriate probative purpose. *(Cf., People v Tas,* 51 NY2d 915).

However, the proposed introduction of evidence of uncharged crimes as relevant to the motive of a witness presents a special problem, and one that demands particularly close judicial scrutiny. There is an obvious, and unusual, potential for unfairness in allowing a witness whose credibility is under challenge to buttress his or her own credibility by attributing to the defendant shocking criminal behavior on the claim that such behavior influenced the witness to testify.

In this case, we see no compelling probative need for introducing evidence with such an enormous potential for prejudice. It is difficult to believe that a jury would not have regarded the shocking events testified to with regard to the immediate case as more than sufficient to explain the witness testifying against the defendant, particularly in a case in which it was confirmed that the witness had immediately communicated with the police, entered into a police car which she had summoned, and within a very short time had dis-

closed the events that she had observed. Indeed, the spontaneous character of her response to the murder she described makes it far more likely that Ms. Wilson reacted to the immediate events, and not on the basis of a reflective judgment of defendant's over-all misbehavior. On any realistic view, the fact that the defendant had repeatedly beaten the witness would most likely have been evaluated under the circumstances as a reason for the witness to give truthful testimony as to what she had observed, not as a motive to manufacture, within moments after the event, the defendant's complicity in a murder that had undeniably occurred.

We are persuaded that the evidence introduced on redirect examination went far beyond that which any balancing test would have justified, and consider it very doubtful that any testimony with regard to such crimes was appropriate.

Undeniably a separate problem was presented here by the character of the witness' unresponsive answer on cross-examination referring to the defendant's course of criminality, defense counsel's failure to object or move to strike the answer, and his follow-up questions based in part upon the answer that she had given. Some limited redirect examination, amplifying what she said, might arguably have been justified lest the jury draw unwarranted inferences with regard to the witness by her unexplained, and sudden, reference to the defendant's crimes. What occurred here went well beyond that which could have been justified.

Whatever basis may arguably be thought to have existed for that which was elicited on the redirect examination, the record is clear that at various points during the trial, evidence of uncharged crimes by the defendant was introduced for which there was little, if any, justification whatever.

Thus, both in his opening statement and in his direct examination of Ms. Wilson, the District Attorney brought out that when the defendant told Ms. Wilson that he had paid a man named Ice to do the killing, the defendant had referred to Ice as someone who "usually does these things for him." In his direct examination, the District Attorney further elicited from the witness, without any discernible appropriate purpose, that she had seen the defendant with a gun on various occasions, and also developed from her testimony regarding the defendant's narcotics activities that went far beyond that which was relevant to the issues in the case.

In his second redirect examination, purportedly in response to the suggestion in the re-cross-examination of the witness

that she wanted to put the defendant in jail in order to protect herself, the District Attorney elicited in detail that the defendant had told her about hiring people to kill others, that she knew that he could arrange to have her killed even while he was in jail and believed that he would do so, and that he had spoken to her about crimes for which he had been arrested and convicted and about his having been in State prison. The ground given to justify that which was elicited in the second redirect examination does not remotely support the introduction of any of this highly prejudicial material.

We have considered defendant's other allegations of error and find these to be without merit. In particular, we think it clear that probable cause to arrest the defendant was presented by the detailed statement of an eyewitness describing his participation in a murder, a statement given within a few hours after the event had occurred by a witness who had called the police immediately after the murder and had, within a few minutes, entered a police car which brought her to a hospital from where she had again communicated with the police to inform them of what she had observed. *(Cf., People v Hicks,* 38 NY2d 90, 93-95.) Concur—Sandler, J. P., Milonas, Kassal, Rosenberger and Wallach, JJ.