Miller, J.,
dissents, and votes to reverse the judgment and order a new trial on the counts of the indictment charging the defendant with bribing a witness: I respectfully dissent.
The Supreme Court’s decision to permit the People to introduce evidence of an uncharged crime during their case-in-chief had a far-reaching impact on the course and character of the defendant’s entire trial. The court’s evidentiary rulings permitted the defendant to be cast as a man who had been involved in a heinous witness-elimination murder and the specter of that uncharged crime overshadowed the charges for which the defendant was on trial. The focus of the trial was so completely shifted to the uncharged murder that the case unraveled into a trial within a trial at which both sides presented the jury with evidence to establish questions of fact relating to the defendant’s involvement in the uncharged crime. The probative value of such evidence, inferential at best, was confined to collateral matters which bore such a slight and tenuous connection to the relevant issues of this case that the prosecutor struggled to articulate its relevance without resorting to empty legalism and metaphor. The prejudice suffered by the defendant as a result of this inflammatory evidence of witness-elimination was severe and unmistakable, yet the prospect of prejudice was wholly ignored by the trial court when it decided to expose the jury to evidence of murder. For these reasons and the ones that follow, I conclude that the defendant was deprived of a fair trial *861 and that he is entitled to a new one on the counts of the indictment charging him with bribing a witness.
The defendant was charged with three counts of tampering with a witness in the third degree (see Penal Law § 215.11) and three counts of bribing a witness (see Penal Law § 215.00). At trial, the People called three young women, all between the ages of 20 and 21 years old (hereinafter collectively the complainants), who each testified that they were present when an individual shot another individual in a park on September 4, 2001. The complainants testified that after being contacted by law enforcement personnel, they eventually identified the defendant’s brother as the shooter and made audiotaped statements in the presence of detectives and an assistant district attorney to that effect.
The complainants stated that sometime in May or June 2002, they began to hear rumors that the defendant was a dangerous person and that he was looking for them. They testified that they heard that the defendant was “mad about his brother” and that he would make sure that they “either lie or die.” The complainants testified that eventually they were each contacted by the defendant, but that he treated them well, lavishing them with gifts and affection. Portions of the complainants’ testimony indicated that the defendant wanted them to recant their identification of his brother as the shooter. In June 2002, the complainants each separately traveled with the defendant to the office of his brother’s attorney, where they made audiotaped recordings in which they recanted their identification of the defendant’s brother and instead indicated, consistent with the defendant’s view, that another individual was responsible for the shooting. The complainants testified that the defendant was present when they recanted their stories and that he gave each of them $500 shortly after they visited the lawyer’s office. The complainants each testified that the statements they gave at the lawyer’s office were not true.
Prior to the beginning of the trial, defense counsel had sought to preclude the prosecution from introducing evidence of an uncharged crime: the murder of a man named Bobby Gibson. The prosecutor opposed defense counsel’s application, arguing that it was “impossible and ludicrous” to separate the two cases, and that precluding reference to the Gibson murder would be “obscene.” The Supreme Court initially concluded that the fact that Gibson was murdered was not necessarily connected to this case. However, the prosecutor argued that this ruling was “outrageous,” and referenced a prior trial in which the same defense attorney allegedly used a favorable evidentiary ruling to deceive *862 the jury. After the prosecutor expressed his personal “belie[f]” that the defendant was “behind the killing of the witness,” the court determined that it would permit the People to introduce evidence relating to that uncharged crime. Defense counsel “vehemently” objected and argued that the prejudice would deprive the defendant of a fair trial.
Based on this pretrial ruling, the People were permitted to elicit evidence, in their case-in-chief, that in June 2002—two days before the defendant’s brother was scheduled to be tried for the shooting—an individual named Bobby Gibson was shot and killed. Gibson was identified as a potential witness in the case against the defendant’s brother, and although the prosecutor repeatedly disclaimed any intention of linking the defendant to Gibson’s murder, he nevertheless elicited evidence from one of the complainants that the defendant had told someone that he wanted to speak with Gibson prior to Gibson’s death. After learning that Gibson had been shot and killed, one of the complainants testified that she thought that she was “next” and she contacted the two other complainants who stated that they did not fear the defendant and had no reason to go to the police.
None of the complainants initiated contact with the police after Gibson was killed. When police contacted the complainants after Gibson’s death, they were told that the complainants had no problems, and the complainants did not request assistance or disclose their interactions with the defendant. However, the police later learned that the complainants had given new statements to the attorney representing the defendant’s brother after receiving a telephone call from one of the complainants. The complainants were then directed to report to the District Attorney’s office, where they were informed that they could be arrested for changing their original statements. Thereafter, the complainants gave new statements consistent with their original statements, and they ultimately testified against the defendant’s brother at his subsequent trial. The People were also permitted to elicit additional testimony on their direct case to establish that in the wake of Gibson’s death, the complainants were placed in a witness protection program where they and their families were provided with housing and other public assistance.
The trial then degenerated into a trial within a trial. In response to the People’s evidence showing that Gibson was killed two days before the trial of the defendant’s brother and shortly after the defendant himself was heard saying he wanted to talk to him, the defendant was permitted to play a videotaped state *863 ment in which an individual named Travis Ragsdale confessed to shooting Gibson. The videotaped statement was admitted for its truth: to demonstrate that Ragsdale was the one who shot and killed Gibson, and that he had not done so intentionally, but rather as a result of an alcohol-related altercation. Ragsdale had been acquitted of first degree (witness-elimination) murder and convicted of second degree murder.
The People then argued that since the videotaped statement was admitted to show that Ragsdale was responsible for the shooting of Gibson and that the shooting was not a witness-elimination murder, they should be permitted to submit rebuttal evidence to show that the defendant was “responsible” for the shooting of Gibson and that Ragsdale’s statement did not preclude the defendant’s “involvement.” The Supreme Court ruled that the videotaped statement “opened the door” to rebuttal evidence and that the People would be permitted to challenge Ragsdale’s credibility and to suggest that the shooting of Gibson was part of a larger crime. On their rebuttal case, the People submitted, inter alia, a report prepared in connection with Gibson’s autopsy which showed that Gibson’s death had been caused by a bullet that entered his lower back, traveled through his abdomen, and perforated his spleen, stomach, liver, and heart.
The jury returned a verdict finding the defendant guilty of the three counts of bribing a witness. The defendant was acquitted of the three counts of tampering with a witness in the third degree. The defendant was subsequently sentenced to three concurrent terms of imprisonment of 15 years to life.
Viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620 [1983]), I agree with my colleagues in the majority that it was legally sufficient to establish beyond a reasonable doubt the defendant’s guilt with respect to the three counts of bribing a witness (see Penal Law § 215.00; cf. People v Bac Tran, 80 NY2d 170, 176 [1992]). Moreover, I also agree that the verdict of guilt was not against the weight of the evidence (see CPL 470.15 [5]; People v Danielson, 9 NY3d 342 [2007]; People v Romero, 7 NY3d 633 [2006]).
Nevertheless, the defendant is entitled to a new trial. “It is a general rule that it is error to receive evidence as proof of the offense charged that an accused has committed a criminal offense other than that charged in the indictment” (People v Thompson, 212 NY 249, 251 [1914]; see Jerome Prince, Richardson on Evidence § 4-501 [Farrell 11th ed, 2008 Supp]). “The rule excluding evidence of uncharged crimes is based upon the human tendency more readily ‘to believe in the guilt of an *864 accused person when it is known or suspected that he [or she] has previously committed a similar crime’ ” (People v Ventimiglia, 52 NY2d 350, 359 [1981], quoting People v Molineux, 168 NY 264, 313 [1901]; People v Allweiss, 48 NY2d 40, 47 [1979]; see People v Zackowitz, 254 NY 192, 198 [1930]). It has been recognized that “[t]he natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge” (People v Zackowitz, 254 NY at 198 [internal quotation marks omitted]). Accordingly, although “[i]t may be logical to conclude from a defendant’s prior crimes that he [or she] is inclined to act criminally,” this evidence is nonetheless “excluded for policy reasons because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past” (People v Arafet, 13 NY3d 460, 465 [2009] [internal quotation marks omitted]; see People v Giles, 11 NY3d 495, 499 [2008]).
However, “[t]he rule does not prohibit the admission of evidence of other . . . acts . . . which reveal or suggest the defendant’s commission of some other crime—when these acts have substantial probative value to prove the crime charged” (Jerome Prince, Richardson on Evidence § 4-501 [Farrell 11th ed, 2008 Supp]; see People v Ventimiglia, 52 NY2d at 359; People v Allweiss, 48 NY2d at 47). Evidence of such acts may be admissible where that evidence is “relevant because of some recognized exception to the general rule . . . for example, to show (1) intent, (2) motive, (3) knowledge, (4) common scheme or plan, or (5) identity of the defendant” (People v Lewis, 69 NY2d 321, 325 [1987]; see People v Molineux, 168 NY at 293).
“Even when admissible for such purposes, however, the evidence may not be received unless its probative value exceeds the potential for prejudice resulting to the defendant” (People v Lewis, 69 NY2d at 325; see People v Cass, 18 NY3d 553, 560 [2012]). “If the evidence is actually of slight value when compared to the possible prejudice to the accused, it should not be admitted, even though it might technically relate to some fact to be proven” (People v Allweiss, 48 NY2d at 47; see People v Giles, 11 NY3d at 499). Indeed, the Court of Appeals has “stressed, yet again, the obligation of trial courts to take special care to ensure not only that the evidence bears some articulable relation to the issue, but also that its probative value in fact warrants its admission despite the potential for prejudice” (People v Bradley, 20 NY3d 128, 134 [2012] [internal quotation marks omitted]).
*865 “There is no litmus paper test for determining when the probative value of the evidence outweighs its potential for prejudice” (People v Ventimiglia, 52 NY2d at 359). “In final analysis the process is one of balancing in which both the degree of probativeness and the potential for prejudice of the proffered evidence must be weighed against each other” (id,.). “Factors which play a part in measuring probative value are ‘the degree to which the evidence persuades the trier of fact that the particular fact exists and the [logical] distance of the particular fact from the ultimate issues of the case’ ” (id., quoting Dolan, Rule 403: The Prejudice Rule in Evidence, 49 So Cal L Rev 220, 233 [1976]). “On the issue of probative value, materiality and necessity are important” (People v Ventimiglia, 52 NY2d at 360 [internal quotation marks omitted]). “The court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference to prove the issue upon which it is offered, that it is offered on an issue material to the prosecution’s case, and is not merely cumulative” (id. [internal quotation marks omitted]).
In sum, the determination of whether evidence of prior bad acts or uncharged crimes may be admitted in a particular case requires a two-part inquiry: “first, the proponent of the evidence must identify some material issue, other than the defendant’s criminal propensity, to which the evidence is directly relevant; once the requisite showing is made, the trial court must weigh the evidence’s probative value against its potential for undue prejudice to the defendant” (People v Cass, 18 NY3d at 560 [citation omitted]).
“Whether evidence of prior crimes may be admitted under the Molineux rule is a question of law, not discretion” (People v Alvino, 71 NY2d 233, 242 [1987]; see People v McKinney, 24 NY2d 180, 185 n 4 [1969]). “If the evidence of prior crimes is probative of a legally relevant and material issue before the court, and for that reason not automatically barred under the general rule, admissibility turns on the discretionary balancing of the probative value and the need for the evidence against the potential for delay, surprise and prejudice” (People v Alvino, 71 NY2d at 242; see People v Agina, 103 AD3d 739, 743 [2013]). Although a trial court enjoys “broad discretion” in deciding whether to admit evidence challenged as unduly prejudicial (People v Cortez, 22 NY3d 1061, 1079 [2014, Abdus-Salaam, J., concurring]), a court nevertheless commits legal error “[w]here [it] has abused its discretion or exercised none at all” (People v Williams, 56 NY2d 236, 239 [1982]; see People v Cortez, 22 NY3d at 1079; People v Davis, 44 NY2d 269, 275 [1978]).
*866 Here, the clearest indication of the Supreme Court’s determination as to the relevancy of Gibson’s murder to the charged crimes is found in its instruction to the jury that the evidence of Gibson’s murder was admitted for the purpose of explaining the complainants’ state of mind and providing background for their participation in the state’s witness protection program. It is true that the state of mind of each of the complainants was relevant to the charges of tampering with a witness in the third degree, since the People were required to show that the defendant attempted to instill fear in them (see Penal Law § 215.11; People v Henderson, 265 AD2d 573, 573-574 [1999]; cf. People v Morris, 82 AD3d 908, 908-909 [2011]). However, the People never sought to use evidence of Gibson’s murder as a means of proving that the defendant had intimidated the complainants into changing their testimony or refusing to testify and, in any event, the evidence did not establish any such logical connection between that crime and crimes with which the defendant was charged.
Despite the intimations of the prosecution to the contrary, the evidence was inadequate to show that the defendant was in any way involved in Gibson’s murder. Thus, to the extent that evidence of Gibson’s murder was presented to the jury in an attempt to establish that the defendant attempted to instill fear in the complainants, it lacked any probative value since, aside from the prosecutor’s improper remarks on summation, the defendant was not adequately linked to that act (see People v Cook, 42 NY2d 204, 208 [1977]; People v Leon, 121 AD2d 1, 9 [1986]; see also People v Randolph, 18 AD3d 1013, 1015-1016 [2005]; People v Rivera, 160 AD2d 267, 271-272 [1990]).
While this lack of a connection to the defendant affected the relevancy and probative value of the disputed evidence of Gibson’s murder, it did not, as the People contend, render such evidence benign. To the contrary, in similar contexts, both this Court and the Court of Appeals have recognized the undue prejudice suffered by defendants through the admission of “highly inflammatory” evidence that is not directly attributed to the defendants, but is nevertheless admitted in the case against them (People v Smith, 52 NY2d 802, 803-804 [1980]; see People v Martinez, 253 AD2d 775, 775-776 [1998]; People v Pascullo, 120 AD2d 687, 689 [1986]).
Moreover, any inference that Gibson was killed in an attempt by the defendant to indirectly influence the complainants’ conduct would have been speculative at best (see generally People v Adames, 52 AD3d 617, 619 [2008]). Indeed, Gibson was shot after the complainants had already changed their stories *867 and after their last contact with the defendant (cf. People v Kyser, 183 AD2d 238, 243 [1992]). In other words, since the alleged tampering and bribery of the complainants had already been accomplished at the time Gibson was shot, evidence of Gibson’s murder simply did not tend to prove any material element in the case (see People v Park, 12 AD3d 942, 944 [2004]; People v Foster, 295 AD2d 110, 112-113 [2002]; see also People v Bell, 217 AD2d 585, 586 [1995]).
Nor was the disputed evidence rendered admissible on the ground that it completed the narrative or furnished background information. The talismanic invocation of these phrases as grounds for the admission of uncharged crimes has prompted the Court of Appeals to note that its use of these phrases in several decisions “should not be interpreted as automatically allowing the prosecution to introduce evidence of uncharged crimes merely because the evidence is said to complete the narrative or furnish background information” (People v Resek, 3 NY3d 385, 390 [2004]).
To be sure, “[i]n appropriate instances, evidence of uncharged crimes may be allowable as background or narrative because juries might ‘wander helpless’ trying to sort out ambiguous but material facts” (id., quoting People v Green, 35 NY2d 437, 441 [1974]; see People v Gleason, 285 App Div 278, 281 [1954]). Here, however, Gibson’s murder constituted an entirely separate event that occurred after the charged crimes were allegedly completed. Proof of Gibson’s murder was not so interwoven with “the evidence on which the guilt or innocence of the defendant [would] be determined” that the jury required knowledge of the murder to make sense of the material facts of the tampering and bribery charges (People v Gleason, 285 App Div at 281; see People v Stanard, 32 NY2d 143, 146-147 [1973]). Indeed, when proof of the charged crime may be amply understood without resort to evidence of an uncharged crime, the Court of Appeals has rejected similar “completing the narrative” contentions as a matter of law, even in circumstances where the uncharged crimes were actually committed contemporaneously with the charged crimes (see People v Resek, 3 NY3d at 389; People v Cook, 42 NY2d at 208; see also People v Foster, 295 AD2d at 112-113).
It is apparent that evidence of Gibson’s murder was not relevant to directly establish any of the elements of the charged crimes, nor was it warranted to explain evidence that was probative of the elements of the charged crimes. The prosecution nevertheless contended that the evidence of Gibson’s murder was probative of the state of mind of each of the complainants to *868 explain why they changed their stories and to explain why they entered into the witness protection program.
However, evidence of the fact that the complainants entered into a witness protection program was itself improperly admitted. There was no reason why the jury needed to be informed, on the People’s direct case, that the complainants had sought refuge in a witness protection program. By placing before the jury evidence that law enforcement deemed it necessary to take the unusual step of affording the complainants near-constant protection, the jury was improperly invited to speculate as to the source of this threat to their safety (see People v Spence, 92 AD3d 905, 905-906 [2012]; People v Leon, 121 AD2d at 9-10). In sum, the need to explain why the complainants were placed in the witness protection program was a self-created problem that stemmed from the improper admission of the witness-protection evidence in the first place (see People v Spence, 92 AD3d at 905-906; People v Leon, 121 AD2d at 9-10). It can hardly be said that such evidence was a “necessity” to the People’s case (People v Ventimiglia, 52 NY2d at 360 [internal quotation marks omitted]).
The People nevertheless contend that defense counsel “opened the door” to the admission of the witness-protection evidence by (1) examining the complainants’ relocation files in preparation for the trial and (2) failing to represent to the trial court that she would not make use of the information contained in those files. These arguments, cited by my colleagues in the majority, would represent a significant expansion of existing law by recognizing that a defense attorney may open the door to otherwise inadmissible evidence before the trial even begins simply by investigating or familiarizing himself or herself with the facts surrounding the case or by exploring possible avenues of impeachment of likely witnesses. This position, if accepted, would also appear to place a burden on a defense attorney to affirmatively certify to a court that he or she will not pursue certain trial strategies before the trial has begun, thereby forcing a defendant to choose among available trial tactics before the People even begin to put on their case. There is no need for any such expansion of the already nebulous “opening the door” jurisprudence, and there has been no citation to any legal authority to support these positions.
Furthermore, since the prosecution did not adequately link the defendant to Gibson’s murder, it could not have served to show that the defendant intended to instill fear in the complainants (see People v Smith, 52 NY2d at 803-804; People v Martinez, 253 AD2d at 775-776; People v Pascullo, 120 AD2d at 689; cf. *869 People v Tas, 51 NY2d 915, 916 [1980]). Indeed, any generalized fear experienced by the complainants that was unattributable to the defendant was not relevant to any material element of the crimes charged. General, nonattributable fear experienced by the complainants as a result of the Gibson murder could only have been relevant to the complainants’ general credibility.
It has been recognized, primarily in other contexts, that evidence of uncharged conduct may be probative where it is “directly bearing on the motive to testify of a critical witness in a criminal trial, whose motive is important to an evaluation of her credibility” (People v Beckles, 128 AD2d 435, 439 [1987]; see People v Anonymous, 275 AD2d 210, 212 [2000], affd 96 NY2d 839 [2001]; People v Folk, 176 AD2d 754, 754-755 [1991]). Here however, the complainants did not testify that their decision to retract their recantations was motivated by their knowledge of Gibson’s murder. There was no direct proof establishing that Gibson’s murder played any role in the complainants’ decision to testify in the way that they did (cf. People v Anonymous, 275 AD2d at 212; People v Folk, 176 AD2d at 754-755). My colleagues in the majority do not conclude otherwise, instead finding that a motivating factor behind the complainants’ decision to testify could “reasonably be inferred” from the evidence of Gibson’s murder.
Even if the evidence of Gibson’s murder was inferentially probative of the complainants’ motive to testify, it was nevertheless error to admit it. To begin, the evidence was improperly admitted during the People’s case-in-chief (cf. People v Edwards, 261 AD2d 260, 261 [1999]; People v Pondexter, 215 AD2d 409, 410 [1995], revd on other grounds 88 NY2d 363 [1996]; People v Wilson, 195 AD2d 493, 493-495 [1993]; People v Rivera, 160 AD2d 267, 271 [1990]; People v Burke, 128 AD2d 542, 543 [1987], affd 72 NY2d 833 [1988]; Jerome Prince, Richardson on Evidence § 6-415 [Farrell 11th ed, 2008 Supp]). The evidence of Gibson’s murder was not made in response to an attack on the credibility of the complainants or to fully explain a matter to which the defendant had “ ‘open[ed] the door’ ” (People v Melendez, 55 NY2d 445, 451 [1982]). Rather, the Supreme Court’s ruling on this matter occurred before the trial even began. In this way the People were permitted to adduce evidence of Gibson’s murder on their direct case, effectively bolstering the credibility of their own witnesses before they were attacked in cross-examination (cf. People v Trowbridge, 305 NY 471, 477 [1953]), notwithstanding that “enhancement of the complaining witness’s credibility [is not] one of the recognized exceptions to the Molineux rule” (People v Harris, 150 AD2d 723, 725 [1989]).
*870 This error does not represent some technical violation of timing, since by permitting this preemptive bolstering, the court effectively deprived defense counsel of a whole range of strategic options as to how to defend against the charges of witness tampering and bribery. As a result, defense counsel was forced to address the issue from the outset of the case and engage in the difficult task of defending against the implication of complicity in an uncharged murder.
It is for this reason that the People’s repeated contention that defense counsel opened the door to such evidence must fail. Defense counsel’s reference in her opening statement to other witnesses to the Sykes murder and her cross-examination of the complainants as to matters concerning the relocation program occurred after the trial court, reversing its earlier ruling, permitted the People to introduce evidence of Gibson’s murder and the complainants’ relocation on their direct case. The People, in effect, seek to justify the admission of the evidence “on the ground that the reception of the evidence was in some way validated after the event” (People v Liller, 26 AD2d 983, 985 [1966, Gibson, P.J., dissenting], revd on dissenting op 20 NY2d 727 [1967]). “Surely, however, it cannot be that defendant had to remain mute after the introduction, over his proper objection, of a mass of damaging and prejudicial evidence as part of the People’s case” (People v Liller, 26 AD2d at 985). Defense counsel’s decision to cast the improperly admitted evidence in the best possible light for her client did not retroactively serve to justify its admission in the first place (see People v Liller, 20 NY2d 727 [1967]).
Even assuming that the evidence of Gibson’s murder was inferentially probative of the complainants’ credibility, this finding by the trial court would only represent the first step in the two-step determination. As previously noted, once the proponent of the evidence identifies “some material issue ... to which the evidence is directly relevant . . . the trial court must weigh the evidence’s probative value against its potential for undue prejudice to the defendant” (People v Cass, 18 NY3d at 560 [citation omitted]).
Here, the Supreme Court failed to either evaluate the potential for undue prejudice to the defendant or weigh it against the probative value of the evidence to the charged crimes. Indeed, “the record shows that the court ended its inquiry at relevance without addressing those other important considerations” (People v Cortez, 22 NY3d at 1080). This failure to exercise its discretion constituted error as a matter of law (see id. at 1079; People v Williams, 56 NY2d at 239-240; People *871 v Davis, 44 NY2d at 276; People v Martinez, 253 AD2d at 776; People v Perkins, 246 AD2d 608, 608 [1998]; People v Mitchell, 209 AD2d 443, 443-444 [1994]; People v Celestino, 201 AD2d 91, 96 [1994]; People v Brown, 194 AD2d 443, 444 [1993]; People v Moore, 156 AD2d 394, 394-395 [1989]).
In the event that the discretionary balancing had been performed by the trial court, or is performed post facto by this Court, any probative value resulting from an inference that could be made regarding the complainants’ general credibility was vastly outweighed by the potential for undue prejudice to the defendant. In this regard, it has been recognized that “[t]here is an obvious, and unusual, potential for unfairness in allowing a witness whose credibility is under challenge to buttress his or her own credibility by attributing to the defendant shocking criminal behavior on the claim that such behavior influenced the witness to testify” (People v Beckles, 128 AD2d at 439). Accordingly, even where a victim has explicitly testified that the defendant’s commission of an uncharged crime was the motivating factor behind his or her decision to come forward, it has been held that the probative value of such evidence was outweighed by the prejudice it would inflict on the defendant (see People v Park, 12 AD3d at 944; People v Beckles, 128 AD2d at 439). Under such circumstances, there is simply “no compelling probative need for introducing evidence with such an enormous potential for prejudice” (People v Beckles, 128 AD2d at 439; see People v Park, 12 AD3d at 944).
The People’s contention that the defendant was not prejudiced by the evidence of Gibson’s murder since he was not directly linked to that crime is without merit and belied by the prosecutor’s own comments during summation during which he utilized the testimony that he had elicited on his direct case to urge the conclusion that the defendant was responsible for Gibson’s murder. In any event, the fact that the evidence did not directly link the defendant to Gibson’s murder “resulted in an implicit invitation to the jury to speculate” that the defendant committed, or was responsible for, that crime (People v Rivera, 160 AD2d at 272). In this regard, the Court of Appeals has noted, “to the extent that the evidence of defendant’s identity as the perpetrator of the uncharged crime is unclear . . . the case becomes a trial within a trial which may result in jury confusion” (People v Robinson, 68 NY2d 541, 550 [1986] [footnote omitted]).
The recognized danger of subjecting a defendant to a trial within a trial was fully realized in this case. Far from completing the narrative of the events that transpired, the admission of *872 the evidence of Gibson’s murder diverted the jury’s attention from the actual crimes charged and left the jury to speculate about the defendant’s role in that shooting. The record demonstrates that the entire trial was so permeated with references and evidence relating to Gibson’s murder that it became a mini-murder trial in and of itself. The jury was informed of Gibson’s murder during jury selection and the prosecutor referred to it in his opening statement, pointedly noting at one point that “[tjhere’s no evidence that you’re going to hear that [the defendant] was anywhere near that location” where Gibson was shot (emphasis added). No fewer than six witnesses testified about Gibson’s murder, a topic which filled over 100 pages of the trial transcript and which was raised on over 80 separate occasions throughout the course of the trial. The prospect for jury speculation compelled the defendant to introduce evidence in an attempt to prove that he was innocent of the uncharged crime. The People were then permitted to attack the credibility of the individual convicted of the Gibson murder and to admit medical evidence pertaining to Gibson’s gunshot wound. Finally, the prosecutor, in his summation, explicitly cultivated jury speculation and tacitly solicited the very prejudice that the Molineux rule is designed to prevent, stating, among other things, “Why did this murder happen the weekend before the witness was supposed to testify? And this is the thing, you can speculate all you want . . . you can say hey, [the defendant] reached out to three witnesses and a fourth one got killed on that weekend, a person that [one of the complainants] said [the defendant] wanted to talk to.”
The unfortunate manner in which the trial spun out of control was born of the trial court’s error in permitting evidence of the uncharged crime to be admitted during the People’s direct case. The impact of this error on the trial was not eliminated by the court’s instruction to the jury that “this defendant . . . has not been charged with causing the death of the witness Bobby Gibson. The People have introduced evidence regarding Mr. Gibson’s death for the purpose of explaining the state of mind of the three complainants . . . and to provide the background for their participation in the witness protection program of the District Attorney’s office.” The instruction merely stated that the defendant had not been charged with Gibson’s murder, thereby inviting retribution from the jury if it speculated that the defendant was responsible for Gibson’s murder, but had somehow avoided prosecution for that crime.
It is also notable that the jury was not instructed as to what limited purpose it could use the evidence of the uncharged crime *873 (cf. People v Rivera, 160 AD2d at 271-272). That limited purpose was far from apparent, as evinced by the People’s labored attempts to articulate justification for the trial court’s ruling and the lengthy legal analysis necessitated on this appeal.
The temptation to speculate as to the defendant’s involvement in Gibson’s murder must be overwhelmingly evident to any reader of the facts of this case. As recognized by the Court of Appeals in a similar context, “while it was not difficult to construct a superficially convincing narrative based on this propensity driven supposition, it is precisely such a carelessly constructed yet highly seductive narrative that the Molineux doctrine prudently excludes from a criminal trial” (People v Cortez, 22 NY3d at 1071-1072 [Lippman, Ch. J., concurring]).
“[T]he more heinous the uncharged crime, the more likely that jurors will be swayed by it, and the difficulty faced by the defendant in seeking to rebut the inference which the uncharged crime evidence brings into play” (People v Robinson, 68 NY2d at 549). The evidence that one of the complainants’ fellow witnesses had been murdered “added facts involving the defendant and others in a web of activity which could only be considered by the jury reprehensible” (People v Stanard, 32 NY2d at 147). The prejudice suffered by the defendant in this case cannot be distilled into a single trial error grounded in State evidentiary law or relegated to harmless error analysis, for it cascaded into every facet of the trial and infected the very fabric of the process. Where, as here, trial error has “operated to deny an[ ] individual defendant his [or her] fundamental right to a fair trial, the reviewing court must reverse the conviction and grant a new trial . . . without regard to any evaluation as to whether the errors contributed to the defendant’s conviction” (People v Crimmins, 36 NY2d 230, 238 [1975]; see People v Mees, 47 NY2d 997, 998 [1979]). “Not only the individual defendant but the public at large is entitled to assurance that there shall be full observance and enforcement of the cardinal right of a defendant to a fair trial” (People v Crimmins, 36 NY2d at 238). “The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right” (id.).
A defendant should only be compelled to defend against the crimes for which he was charged. Accordingly, I vote to reverse the judgment and order a new trial on the counts of the indictment charging the defendant with bribing a witness.